# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 14, 2010   Decided January 21, 2011

No. 09-5324

DAVID PATCHAK,
APPELLANT

v.

KENNETH LEE SALAZAR, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01331)

*John J. Bursch* argued the cause for appellant. With him on the briefs was *Daniel P. Ettinger*.

*Aaron P. Avila*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief was *Elizabeth Ann Peterson*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Edward C. DuMont* argued the cause for appellee Match-E-Be-Nash-She-Wish band of Pottawatomi Indians.

With him on the brief were *Seth P. Waxman*, *Demian S. Ahn*, *Conly J. Schulte*, and *Shilee T. Mullin*.

*John H. Dossett* and *Riyaz A. Kanji* were on the brief for *amicus curiae* National Congress of American Indians in support of appellees.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*:  The district court dismissed David Patchak's suit to prevent the Secretary of the Interior from holding land in trust for an Indian tribe in Michigan.  Patchak's appeal presents two jurisdictional issues: whether, as the district court held, he lacks standing; and whether, if he has standing, sovereign immunity bars his suit.

The land consists of 147 acres in Wayland Township, Michigan, a rural, sparsely populated farming community.  The Secretary published in the Federal Register his decision to take this property—the Bradley Tract—into trust for the Match-E-Be-Nash-She-Wish Band, also known as the Gun Lake Band. 70 Fed. Reg. 25,596 (May 13, 2005).  The Band owned the land and wanted to construct and operate a gambling facility there. To do this, the Band had to convince the Interior Secretary to take title to the land into trust pursuant to the Indian Gaming Regulatory Act.  *See* 25 U.S.C. §§ 2701–21; *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 191-92 (D.C. Cir. 2010).

The Secretary's notice in the Federal Register announced that he  would wait at least thirty days before consummating the transaction.  The purpose of the delay, which 25 C.F.R.

§ 151.12(b) required, was "to afford interested parties the opportunity to seek judicial review of the final administrative decisions to take land in trust for Indian tribes and individual Indians before transfer of title to the property occurs." 70 Fed. Reg. at 25,596.

During the thirty-day period, an anti-gambling organization—"MichGO"—brought an action claiming that the Secretary had violated the National Environmental Policy Act and the Indian Gaming Regulatory Act. The district court issued a stay of the Secretary's action. The court later dismissed the organization's suit, and this court affirmed. *See Mich. Gambling Opposition* (*MichGO) v. Norton*, 477 F. Supp. 2d 1 (D.D.C. 2007), *aff'd sub nom. Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008).

In the meantime, Patchak filed his complaint. He alleged that he lived near the Bradley Tract; that the Tribe's gaming facility would attract 3.1 million visitors per year; that this would destroy the peace and quiet of the area; that there would be air, noise and water pollution; that there would be increased crime in the area and a diversion of police and medical resources; and that the Secretary's proposed action was *ultra vires*. Patchak invoked general federal question jurisdiction and the Administrative Procedure Act. He claimed that because the Gun Lake Band was not under federal jurisdiction in 1934, the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-79, did not authorize the Secretary to take the Band's land into trust. The Gun Lake Band intervened as a defendant.

After this court affirmed the dismissal of the *MichGO* action, the stay expired. The district court then denied Patchak's emergency motion for an order preventing the Secretary from proceeding with the land transaction. On January 30, 2009, the Secretary took the Bradley Tract into trust. Three weeks later,

on February 24, the Supreme Court issued its opinion in *Carcieri v. Salazar*, 129 S.Ct. 1058 (2009). The Court agreed with Patchak's argument that § 479 of the Indian Reorganization Act—the IRA—limited the Secretary's trust authority to Indian tribes under federal jurisdiction when the IRA became law in 1934.

Despite *Carcieri*, the Secretary urged the district court to dismiss Patchak's suit. He argued that the Quiet Title Act, 28 U.S.C. § 2409a, precluded any person from seeking to divest the United States of title to Indian trust lands. In other words, by taking the Bradley Tract into trust for the Gun Lake Band while Patchak's suit was pending, the Secretary deprived the court of jurisdiction.

In August 2009, the district court dismissed the suit on a different ground—namely, that Patchak, "at a minimum, lacks prudential standing to challenge Interior's authority pursuant to section 5 of the IRA." *Patchak v. Salazar*, 646 F. Supp. 2d 72, 76 (D.D.C. 2009). The court reasoned that Patchak's "interests do not only not fall within the IRA's zone-of-interests, but actively run contrary to it." *Id.* at 78. The court also expressed doubt about its subject matter jurisdiction in light of the Quiet Title Act. *Id.* at 78 n.12.

I

There is no doubt that Patchak satisfied the standing requirements derived from Article III of the Constitution. Neither the Secretary nor the Band argues otherwise. In terms of Article III standing, the impact of the Band's facility on Patchak's way of life constituted an injury-in-fact fairly trace-able to the Secretary's fee-to-trust decision, an injury the court could redress with an injunction that would in effect prevent the

Band from conducting gaming on the property. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

We believe, contrary to the district court, that Patchak also fulfilled the judicially created zone-of-interests test for standing. The test began as a "gloss" on § 702 of the Administrative Procedure Act, 5 U.S.C. § 702. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395-96 (1987). Section 702 allows judicial review of agency action by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." As the Supreme Court formulated the test in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153 (1970), the "adversely affected or aggrieved" plaintiff must be trying to protect an interest of his that is "*arguably* within the zone of interests to be protected" by the "relevant" statutory provisions. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998).

The Supreme Court introduced the zone-of-interests test in recognition of the "trend . . . toward enlargement of the class of people who may protest administrative action." *Data Processing*, 397 U.S. at 154. The APA had "pared back traditional prudential limitations." *FAIC Sec., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985). Given the APA's "generous review provisions," *Bennett v. Spear*, 520 U.S. 154, 163 (1997) (internal quotation marks omitted), and the "drive for enlarging the category of aggrieved 'persons,'" *Data Processing*, 397 U.S. at 154, the test is not "especially demanding," *Clarke*, 479 U.S. at 399-400.

The Secretary tells us that the Indian Reorganization Act is "not concerned with the interests that Patchak asserts in this litigation." DOI Br. 31. The Band adds that the function of the IRA is to "give the Indians the control of their own affairs and

of their own property." *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quoting 78 Cong. Rec. 11125 (1934)). But application of the zone-of-interests test does not turn on such generalities. *See Nat'l Credit Union Admin.*, 522 U.S. at 492-93. Patchak did not have to show that the Indian Reorganization Act was meant to benefit those in his situation. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998); *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 815 (D.C. Cir. 2005). The "analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova*, 140 F.3d at 1075.

As the Secretary's announcement in the Federal Register stated, IRA § 465 (and the definition of Indians in § 479)[1] served

---

[1] Section 465 states:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: *Provided*, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in

as the predicate for the government's taking the Gun Lake Band's property into trust for the purpose of gaming under § 2719(b)(1)(B)(ii) of the Gaming Act.[2] The IRA provisions

---

> Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.
>
> The unexpended balances of any appropriations made pursuant to this section shall remain available until expended.
>
> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

Section 479 defines "Indians" to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood."

[2] *See* 70 Fed. Reg. at 25,596. The Gaming Act permits federally recognized Indian tribes to conduct gaming on "Indian lands." The Act defines "Indian lands" to mean all lands within any Indian reservation and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe . . .." 25 U.S.C. § 2703(4). Indian gaming is not permitted on "newly acquired lands"—that is, lands the Secretary took into trust for a tribe after October 17, 1988, when the Gaming Act went into effect. An exception to this bar, on which the Secretary relied in accepting the Bradley Tract, allows Indian gaming on lands the Secretary takes into

interpreted in *Carcieri v. Salazar*, 129 S.Ct. at 1066, limit the Secretary's trust authority. He may act only on behalf of tribes that were under federal jurisdiction at the time of the IRA's enactment in 1934. When that limitation blocks Indian gaming, as Patchak claims it should have in this case, the interests of those in the surrounding community—or at least those who would suffer from living near a gambling operation—are arguably protected. And because of their interests, they are proper parties to enforce the IRA's restrictions.

In reaching this conclusion, we have not—as the Secretary would have it—viewed the IRA provisions in isolation. Patchak's asserted injuries are the "negative effects of building and operating a casino" in his community. The Secretary claims that these "vague and generalized grievances have nothing to do with the purposes for which Congress enacted 25 U.S.C. § 465" and thus do not grant him prudential standing. DOI Br. 32. But Patchak's standing—for purposes of both Article III and the zone-of-interests test—must be evaluated in light of the intended use of the property. The IRA provisions are linked to the Gaming Act. *See Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 530 (1991). In its fee-to-trust application filed with the Secretary, the Gun Lake Band invoked both statutes. One of the considerations in the Secretary's decision whether to take land into trust pursuant to the IRA is whether doing so would "further economic development . . . among the Tribes." *See Mich. Gambling Opposition*, 525 F.3d at 31. Indian gaming is meant to do just that. 25 U.S.C. § 2701(4). Taken together, the limitations in these statutes arguably protected Patchak from the "negative effects" of an Indian gambling facility.

---

trust after the 1988 date "as part of . . . the initial reservation of an Indian tribe." *Id.* § 2719(b)(1)(B)(ii); *see Butte Cnty., Cal.*, 613 F.3d at 191-92.

The Interior Department itself recognizes the interests of individuals like Patchak who live close to proposed Indian gaming establishments. A regulation already mentioned (25 C.F.R. § 151.12(b)) gives "affected members of the public" thirty days to seek judicial review before the Secretary takes land into trust for an Indian tribe. 61 Fed. Reg. 18,082 (1996). By any measure, Patchak fits within the category of "affected members of the public." Other regulations require the Secretary to consider the purpose for which the land will be used and whether taking a tribe's land into trust would give rise to "potential conflicts of land use." 25 C.F.R. § 151.10(c), (f). Internal memoranda regarding the Band's application show that members of the Interior Department considered such conflicts here and accepted the Wayland Township Supervisor's assertion that the gaming facility would be "compatible with the surrounding land use." We realize that the APA and *Data Processing* require the litigant's interests to be measured by statutes not regulations. *See Nat'l Fed'n of Fed. Emps. v. Cheney*, 883 F.2d 1038, 1043 (D.C. Cir. 1989). But regulations implementing statutes may cast some light on what the statutes arguably protect.

The Secretary argues that the State of Michigan, not Patchak, is the proper entity to police the Secretary's authority to take lands into trust under the IRA. He acknowledges cases in which states or municipalities or their officials have been allowed to sue to prevent the Secretary from taking land into trust for the purposes of Indian gaming. *See, e.g.*, *Nebraska ex rel. Bruning v. U.S. Dep't of Interior*, 625 F.3d 501 (8th Cir. 2010); *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250 (10th Cir. 2001). *Carcieri v. Salazar* is another example, although the land there was to be used for Indian housing rather than gaming. 129 S.Ct. at 1060. (The plaintiffs in *Carcieri* were a town, a state and the governor.) The Secretary offers a distinction between those cases and Patchak's: a state in which the land is

located is a proper entity to police the Secretary's trust decision "because it stands to lose some of its regulatory authority as a result of Interior's trust acquisition." DOI Br. 36-37. But the distinction cannot hold. If the interests of a state or a municipality are within the zone of interests the IRA protects then so are Patchak's interests. A state may, as the Secretary contends, lose some regulatory authority and, depending on the intended use of the trust land, some tax revenue. *But see Cotton Petrol. Corp. v. New Mexico*, 490 U.S. 163 (1989). But the Secretary is merely describing the nature of the state's injuries. Patchak's injuries may be different, but they are just as cognizable. Among other things, he alleged that the rural character of the area would be destroyed, that the value of his property would be diminished and that he would lose the enjoyment of the agricultural land surrounding the casino site. These sorts of injuries have long been considered sufficient for purposes of standing. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972).

As a practical matter it would be very strange to deny Patchak standing in this case. His stake in opposing the Band's casino is intense and obvious. The zone-of-interests test weeds out litigants who lack a sufficient interest in the controversy, litigants whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. Patchak is surely not in that category. We therefore hold that he had prudential standing to bring this action.

II

This brings us to the question whether the government has consented to Patchak's suit.

Section 702 of the APA waives the government's sovereign immunity in the following terms: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702. Patchak does not seek money damages and he has stated a claim that an agency—the Interior Department—and its Secretary acted under color of legal authority.

Patchak's action therefore seems to fit within the waiver of sovereign immunity in § 702. But the last clause of the section states: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." The Secretary argues that the Quiet Title Act is such a statute.

We set forth the relevant provisions of the Quiet Title Act in the margin.[3] The Act, in its first subsection, waives sovereign

---

[3] 28 U.S.C. § 2409a provides in relevant part:

(a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands, nor does it apply to or affect actions which may be or could have been brought under sections 1346, 1347, 1491, or 2410 of this title, sections 7424, 7425, or 7426 of the Internal Revenue Code of 1986, as amended (26 U.S.C. 7424, 7425, and 7426), or section 208 of the Act of July 10, 1952 (43 U.S.C. 666).

immunity: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a). This is followed by the provision that directly concerns us: "This section does not apply to trust or restricted Indian lands . . .." *Ibid.* The Supreme Court has held that the Act provides "the exclusive means by which adverse claimants c[an] challenge the United States' title to real property," *Block v. North Dakota*, 461 U.S. 273, 286 (1983), and that, when applicable, the Indian lands exception operates "to retain the United States' immunity to suit," *United States v. Mottaz*, 476 U.S. 834, 842 (1986).

---

(b) The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

(c) No preliminary injunction shall issue in any action brought under this section.

(d) The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.

The proper question therefore is whether Patchak's suit is, in the words of the statute, the sort of "action under this section" for which the United States has waived sovereign immunity except with respect to Indian lands. That is, did Patchak bring a Quiet Title Act case? *Cf. Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992). If not, the Quiet Title Act does not forbid the relief Patchak seeks, and the APA has waived the government's immunity from suit. *Id.* at 609; *see also Block v. North Dakota*, 461 U.S. 273, 286 n.22 (1983).

The official name of the Quiet Title Act, passed in 1972, was "An Act to permit suits to adjudicate certain real property quiet title actions." Pub. L. No. 92-562, 86 Stat. 1176.[4] This provides a clue about the statute's coverage. Actions to "quiet title" originated in the courts of equity as a means of preventing a multiplicity of suits at law. 4 POMEROY, EQUITY JURISPRUDENCE § 1394 (5th ed. 1941). Referred to as either "bills of peace" or "bills *quia timet*," they existed in two forms. The first allowed the holder of legal title to land to prevent a single adverse claimant from bringing successive actions of ejectment against the plaintiff for the same parcel. 1 *Id.* § 253. For equity to intervene, the plaintiff was required to be in possession of the land and to have sufficiently established his title in at least one previous action at law. *Ibid.* The second form allowed the holder of legal or equitable title to land to bring one suit against many persons asserting equitable titles to the same land. 4 *Id.* § 1396. Like the first form, plaintiffs were required to be in

---

[4] Before enactment of the Quiet Title Act, an adverse claimant's only legal remedy was an action for just compensation under the Tucker Act, 28 U.S.C. § 1491. Unless the United States voluntarily instituted a quiet title action or the claimant successfully petitioned Congress or the Executive for discretionary relief, he could not recover possession of the property. *See Block*, 461 U.S. at 280-81.

possession of the land in dispute. *Ibid.* Later statutes expanded quiet title actions, sometimes removing the requirement of possession, *ibid.*, and often allowing the actions to determine ownership. *See* DOUGLAS LAYCOCK, MODERN AMERICAN REMEDIES 551 (3d ed. 2002).

As should be apparent from this summary, a common feature of quiet title actions is missing from this case. In each of the forms just mentioned, the plaintiff would seek to establish his rightful title to the real property. The modern definition of the action is the same: "A proceeding to establish a plaintiff's title to land by compelling the adverse claimant to establish a claim or be forever estopped from asserting it." BLACK'S LAW DICTIONARY 34 (9th ed. 2009). Patchak is not requesting relief of that sort; he mounts no claim of ownership of the Bradley Tract. We recognize that the title of a statute cannot alter the meaning of the statute's operative language. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). But it is of some interpretive use. *Ibid.* And here there is more than just the title. As part of the same 1972 legislation, Congress amended the venue statute to provide that "[a]ny civil action under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States" shall be brought in the district where the property is located. 28 U.S.C. § 1402(d).[5] Congress also gave the district courts jurisdiction over civil actions "under section 2409a to quiet title." 28 U.S.C. § 1346(f). Congress thus viewed § 2409a as authorizing a proceeding known as a "quiet title" action. And the language of § 2409a firmly indicates that Congress intended

---

[5] *See also* 28 U.S.C. § 2410(a)(1), dealing with "quiet title" actions involving property in which the United States holds a security interest.

to enact legislation building upon the traditional concept of an action to quiet title.[6]

This much is apparent from the Act's pleading requirement. "The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, [and] the circumstance under which it was acquired . . .." 28 U.S.C. § 2409a(d).  Failure to comply may result in dismissal of the complaint.  *See, e.g.*, *Kinscherff v. United States*, 586 F.2d 159, 160-61 (10th Cir. 1978).  This

---

[6] As the Department of Justice put it:

> The bill would allow the United States to be made a party to an action in the Federal district courts to quiet title to lands in which the United States claims an interest.

> Suits to quiet title or to remove a cloud on title originated in the equity court of England.  They were in the nature of bills *quia timet*, which allowed the plaintiff to institute suit when an action would not lie in a court of law.  For instance, a plaintiff whose title to land was continually being subjected to litigation in the law courts could bring a suit to quiet title in a court of equity in order to obtain an adjudication on title and relief against further suits.  Similarly, one who feared that an outstand [sic] deed or other interest might cause a claim to be presented in the future could maintain a suit to remove a cloud on title.  The plaintiff in such suits was required to be in possession, and the usual grounds of equitable jurisdiction (an imminent threat and an inadequate remedy at law) had to be present.

Letter from Attorney General to Speaker, House of Representatives, *reprinted in* H.R. Rep. No. 92-1559, at 8-9 (1972).

provision tells us what constitutes an "action under this section." 28 U.S.C. § 2409a(a). It is an action in which the plaintiff is claiming an interest in real property contrary to the government's claim of interest. Neither the brief of the Secretary nor that of the Band confronts this language.

Nor do they deal with subsection (b) of the Act. This provision gives the United States the option of retaining possession of the property if it loses the quiet title action, so long as the government pays just compensation to the person entitled to the property. *Id.* § 2409a(b). The provision is senseless unless there is someone else—the plaintiff—claiming ownership. Again, the type of action contemplated in the Quiet Title Act does not encompass Patchak's lawsuit.

The origins of the Act and the committee reports accompanying it contain examples of the types of suits the legislation was expected to cover. *See Suits to Adjudicate Disputed Titles to Land in Which the United States Claims an Interest: Hearing Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary on S. 216*, 95th Cong. 2-6 (1972) (statement of Sen. Frank Church) ("House Judiciary Committee Hearing"); H.R. Rep. No. 92-1559 (1972); S. Rep. No. 92-575 (1971). All of these examples were suits in which plaintiffs claimed title to property. *E.g.*, H.R. Rep. No. 92-1559, at 6; S. Rep. No. 92-575, at 1, 5; *Dispute of Titles on Public Lands: Hearing Before the Subcomm. on Pub. Lands of the S. Comm. on Interior and Insular Affairs*, 92d Congress 20, 55 (1971); House Judiciary Committee Hearing, *supra*, at 45-46 (statement of R. Blair Reynolds).

Two Supreme Court decisions have interpreted the Quiet Title Act. Neither is inconsistent with our view that Patchak's suit is not an action under that statute, although the government and the Band try to convince us otherwise. *Block v. North Da-*

*kota*, 461 U.S. 273 (1983), was a typical quiet title action. As the Court put it, "the United States and North Dakota assert competing claims to title to certain portions of the bed of the Little Missouri River within North Dakota." *Id.* at 277. The Court held in *Block* that the Quiet Title Act was "the exclusive means by which adverse claimants could challenge the United States' title to real property." *Id.* at 286. But by "adverse claimant" the Court meant "States and all others asserting title to land claimed by the United States," *id.* at 280, a description that does not fit Patchak.

Three years later, the Court took up the Quiet Title Act once more in *United States v. Mottaz*, 476 U.S. 834 (1986). The issue was, as in *Block,* the applicability of the Act's twelve-year statute of limitations. The plaintiff claimed that the Bureau of Indian Affairs had sold three parcels of land in which she had an interest to the United States Forest Service and the Chippewa National Forest "without [her] consent or permission." *Id.* at 838. She requested "[d]amages in a monetary sum equal to the current fair market value of each parcel illegally transferred," invoking several jurisdictional grants (not including the Quiet Title Act). *Ibid.* (internal quotation marks omitted) (alteration in original). The Court held again that the Quiet Title Act provides the exclusive means for "adverse claimants" to challenge the United States' title. *Id.* at 841. Mottaz sought "a declaration that she alone possesses valid title to her interests in the [parcels of land] and that the title asserted by the United States is defective." *Id.* at 842. Her claim was therefore "clearly . . . within the Act's scope." *Ibid.* Because her claim had accrued more than twelve years before she filed her complaint, it was barred. *Id.* at 844.

In short, the plaintiffs in *Block* and *Mottaz* were the type of "adverse claimants" traditionally found in quiet title actions. Patchak's position is different. He does not seek a declaration

that "[]he alone possesses valid title" to the Bradley Tract, *Mottaz*, 476 U.S. at 842, and he is not an adverse claimant.

We acknowledge the views of the Ninth, Tenth and Eleventh Circuits that this difference does not matter, that the Quiet Title Act bars suits seeking to "divest[] the United States of its title to land held for the benefit of an Indian tribe," whether or not the plaintiff asserts any claim to title in the land. *Fla. Dep't of Bus. Regulation v. Dep't of Interior*, 768 F.2d 1248, 1253-55 (11th Cir. 1985); *see also Neighbors for Rational Dev., Inc. v. Norton*, 379 F.3d 956, 961-63 (10th Cir. 2004); *Metro. Water Dist. of S. Cal. v. United States*, 830 F.2d 139, 143-44 (9th Cir. 1987).

These opinions appear to rest on two related rationales, neither of which we find convincing. The first is that the legislative history of the Indian lands exception shows that it rested on the federal government's "solemn obligations . . . to the Indian people." *Neighbors*, 379 F.3d at 962 (quoting H.R. Rep. No. 92-1559, at 13 (1972) (letter from Mitchell Melich, Solicitor for the Dep't of the Interior)); *see also Metro. Water Dist.*, 830 F.2d at 143-44; *Fla. Dep't*, 768 F.2d at 1253-54. This may be true, but we do not see why that should alter our analysis. If Patchak's suit is the type of quiet title action the Act governs, then the fact that the disputed property is Indian trust land means that government has not waived sovereign immunity. It also means that Patchak could not rely on § 702 of the APA to supply the missing consent to suit. On the other hand, if—as we believe—Patchak's suit is not governed by the Quiet Title Act, then § 702 of the APA waives the government's sovereign immunity.

The second rationale is this: "If Congress was unwilling to allow a plaintiff claiming title to land to challenge the United States' title to trust land, we think it highly unlikely Congress

intended to allow a plaintiff with no claimed property rights to challenge the United States' title to trust lands." *Neighbors*, 379 F.3d at 963; *see Fla. Dep't*, 768 F.2d at 1254-55. We do not find the point at all telling. Congress passed the Quiet Title Act in 1972. At the time there was no general waiver of the government's sovereign immunity for non-monetary actions. The 1972 Congress therefore did not have to concern itself with plaintiffs such as Patchak who were not seeking to quiet title. Patchak could not have successfully sued the United States over the Bradley Tract even if Congress had not inserted the Indian lands exception in the Quiet Title Act. Given these circumstances, it seems to us rather far-fetched to attribute an intention to the 1972 Congress about a subject not within the terms of the statutory language.

Matters changed in 1976 when Congress amended the APA to include a general waiver of sovereign immunity. Act of Oct. 21, 1976, Pub. L. No. 94-574, 90 Stat. 2721 (amending 5 U.S.C. § 702). This legislation, recommended by the Administrative Conference of the United States[7] and supported by the Department of Justice,[8] was consistent with the trend toward easing restrictions on judicial review of administrative action, a trend identified in *Data Processing*, 397 U.S. at 154, and its companion case, *Barlow v. Collins*, 397 U.S. 159, 166 (1970). As then–Assistant Attorney General Antonin Scalia explained in a letter to Senator Kennedy, one of the main reasons for abolishing sovereign immunity in these kinds of cases was "the failure

---

[7] 1 RECOMMENDATIONS AND REPORTS OF THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES 23-24 (1970).

[8] Letter from Antonin Scalia, Assistant Att'y Gen., Office of Legal Counsel, to Edward M. Kennedy, Chairman, Subcomm. on Admin. Practice & Procedure, U.S. Senate, *reprinted in* H.R. Rep. No. 94-1656, at 25.

of the criteria for sovereign immunity, as they have been expressed in a long and bewildering series of Supreme Court cases, to bear any relationship to the real factors" that should control.[9]  By waiving sovereign immunity, Congress sought to ensure that courts could review "the legality of official conduct which adversely affects private persons."  H.R. Rep. No. 94-1656, at 5.  As the House Report put it:

> Just as there is little reason why the United States as a landowner should be treated any differently from other landowners in an action to quiet title, so too has the time now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or offer acting in an official capacity.

*Id.* at 9.

We may agree that the Quiet Title Act of 1972 reflects a congressional policy of honoring the federal government's solemn obligations to Indians with respect to title disputes over Indian trust land.  We may also agree that the amendment to § 702 of the APA in 1976 reflects a congressional policy of easing restrictions on judicial review of agency action seeking non-monetary relief.  Which of these policies should prevail?  The courts of appeals mentioned above have extended the reach of the Quiet Title Act beyond its text to favor one policy without giving any indication that they considered the other.  For our part, we agree with the Supreme Court in *Carcieri* that we need

---

[9] Letter from Antonin Scalia, *supra* note 8, at 26; *see also* Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 MICH. L. REV. 867 (1970).

not chose between "these competing policy views." 129 S.Ct. at 1066-67. For the reasons we have discussed, it is enough that the terms of the Quiet Title Act do not cover Patchak's suit. His action therefore falls within the general waiver of sovereign immunity set forth in § 702 of the APA.[10]

\*\*\*

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[10] In light of our determination that the Quiet Title Act does not bar Patchak's claim, we do not address whether sovereign immunity should be determined as of the date his complaint was filed rather than after the Secretary took the land into trust. *Cf. Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 570 (2004). We also decline Patchak's request that we decide whether the Band was under federal jurisdiction in 1934, or any other remaining issues. *See Doe v. diGenova*, 779 F.2d 74, 89 (D.C. Cir. 1985).