# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 13, 2016           Decided July 15, 2016

No. 15-5200

DAVID PATCHAK,
APPELLANT

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01331)

*Sharon Y. Eubanks* argued the cause and filed the briefs for Appellant.

*Lane N. McFadden*, Attorney, U.S. Department of Justice, argued the cause for federal Appellees. With him on the brief was *John C. Cruden*, Assistant Attorney General.

*Nicole E. Ducheneaux* and *Conly J. Schulte* were on the brief for intervenor Defendant-Appellees Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  David Patchak brought this suit under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, challenging the authority of the Department of the Interior to take title to a particular tract of land under the Indian Reorganization Act (IRA), 25 U.S.C. § 465.  The land, called the Bradley Property, had been put into trust for the use of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians in Michigan, otherwise known as the Gun Lake Band or the Gun Lake Tribe.

Following the Supreme Court's determination in 2012 that Mr. Patchak had prudential standing to bring this lawsuit, *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2212 (2012), Congress passed the Gun Lake Trust Land Reaffirmation Act (the Gun Lake Act), Pub. L. No. 113-179, 128 Stat. 1913 (2014), a stand-alone statute reaffirming the Department of the Interior's decision to take the land in question into trust for the Gun Lake Tribe, and removing jurisdiction from the federal courts over any actions relating to that property.  Taking into account this new legal landscape, the District Court determined on summary judgment that it was stripped of its jurisdiction to consider Mr. Patchak's claim.  Holding additionally that the Act was not constitutionally infirm, as Mr. Patchak contended, the District Court dismissed the case.

Mr. Patchak now appeals the dismissal of his suit, as well as a collateral decision regarding the District Court's denial of a motion to strike a supplement to the administrative record.  For the reasons stated below, we affirm the District Court's determination that the Gun Lake Act is constitutionally sound and, accordingly, that Mr. Patchak's suit must be dismissed.  We further conclude that the District Court did not abuse its

discretion by denying Mr. Patchak's motion to strike a supplement to the administrative record.

**I.**

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the Gun Lake Tribe) is an Indian tribe whose members descend from a band of Pottawatomi Indians, led by Chief Match-E-Be-Nash-She-Wish, who occupied present day western Michigan. *See Proposed Findings for Acknowledgement of the Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan*, 62 Fed. Reg. 38113, 38113 (July 16, 1997). While the Tribe had been a party to many treaties with the United States government in the 18th and 19th centuries, it only began pursuing federal acknowledgement under the modern regulatory regime of the Bureau of Indian Affairs, 25 C.F.R. §§ 83.1-83.46, in 1992. The Tribe was formally recognized by the Department of the Interior in 1999. In 2001, the Tribe petitioned for a tract of land in Wayland Township, Michigan – called the Bradley Property – to be put into trust under the IRA. The Tribe sought to use the land to construct and operate a gaming and entertainment facility. The Bureau of Indian Affairs approved the petition in 2005, placing the Bradley Property into trust for the Tribe's use. *See Notice of Determination*, 70 Fed. Reg. 25596, 25596 (May 13, 2005). The Gun Lake Casino opened on February 10, 2011.

David Patchak lives in a rural area of Wayland Township commonly referred to as Shelbyville, in close proximity to the Bradley Property. Mr. Patchak asserts that he moved to the area because of its unique rural setting, and that he values the quiet life afforded him there. Mr. Patchak filed the present lawsuit against the Secretary of the Interior and the Assistant Secretary of the Interior for the Bureau of Indian Affairs on

August 1, 2008, invoking the court's jurisdiction under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 705. Mr. Patchak claimed that he would be injured by the construction and operation of a casino in his community because it would, among other things, irreversibly change the rural character of the area, increase traffic and pollution, and divert local resources away from existing residents. Mr. Patchak argued that because the Tribe was not formally recognized when the IRA was enacted in June 1934, the Secretary lacked the authority to put the Bradley Property into trust for the Gun Lake Tribe.[1] The Gun Lake Tribe intervened as a defendant.

In response to Mr. Patchak's complaint, the United States and the Tribe claimed that Mr. Patchak lacked prudential standing because his interest in the Bradley Property was "fundamentally at odds with the purpose of the IRA" and he therefore did not fall within the IRA's "zone of interests." *Patchak v. Salazar*, 646 F. Supp. 2d 72, 76 (D.D.C. 2009). The District Court agreed, and dismissed the complaint for lack of subject matter jurisdiction. *Id.* at 76, 79. Patchak appealed to this Court, and we reversed. *See Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2011). The Supreme Court agreed, holding that Patchak did indeed have prudential standing to bring his suit. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 132 S. Ct. at 2212. The case was remanded to the District Court for further proceedings.

---

[1] Mr. Patchak's arguments on the merits of his claim rely heavily on the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009), published after he initially filed his lawsuit. *Carcieri* interpreted part of the recognition provision of the IRA, 25 U.S.C. § 479. 555 U.S. at 387-93. Because we do not reach the merits of Mr. Patchak's claim in this appeal, we do not consider the impact of *Carcieri* in this case.

In the time between the Supreme Court's prudential standing determination and the parties' renewed attention to the case, both the Department of the Interior and Congress weighed in further on the legal status of the Gun Lake Tribe and the Bradley Property, respectively. First, the Department of the Interior issued an Amended Notice of Decision approving an application the Tribe had submitted for two other parcels of land it sought to acquire. As part of this Notice of Decision, the Secretary expressly considered, and confirmed, its authority to take land into trust for the benefit of the Gun Lake Tribe. Second, on September 26, 2014, President Obama signed the Gun Lake Act into law. The substantive text of the Gun Lake Act is as follows:

(a) IN GENERAL.—The land taken into trust by the United States for the benefit of the Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians and described in the final Notice of Determination of the Department of the Interior (70 Fed. Reg. 25596 (May 13, 2005)) is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed.

(b) NO CLAIMS.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed.

(c) RETENTION OF FUTURE RIGHTS.—Nothing in this Act alters or diminishes the right of the Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians from seeking to have any additional land taken into trust by the United States for the benefit of the Band.

Gun Lake Act § 2.

Shortly following the enactment of the Gun Lake Act, the parties filed motions for summary judgment. The District Court determined that, as a result of this legislation, it was now stripped of jurisdiction to consider Mr. Patchak's claim. *See Patchak v. Jewell*, 109 F. Supp. 3d 152, 159 (D.D.C. 2015). Rejecting Mr. Patchak's constitutional challenges to the Gun Lake Act, the District Court granted summary judgment in favor of the Government and the Tribe, and dismissed the case. *Id.* at 160-65. The District Court also denied Mr. Patchak's Motion to Strike the Administrative Record Supplement, which had challenged the addition of the Amended Notice of Decision to the record before the court. *See* Order, *Patchak v. Jewell*, Civil Action No. 08-1331 (RJL), Docket No. 93 (D.D.C. June 17, 2015). Mr. Patchak now appeals those decisions.

## II.

The language of the Gun Lake Act makes plain that Congress has stripped federal courts of subject matter jurisdiction to consider the merits of Mr. Patchak's complaint, which undisputedly "relat[es] to the land described" in Section 2(a) of the Act. Gun Lake Act § 2(b). Accordingly, Patchak's suit "shall not be . . . maintained . . . and shall be promptly dismissed." *Id.* Of course, this is only so if the Gun Lake Act is not otherwise constitutionally infirm, as "a statute's use of the language of jurisdiction cannot operate as a talisman that *ipso facto* sweeps aside every possible constitutional objection." *Nat'l Coal. to Save Our Mall v. Norton*, 269 F.3d 1092, 1096 (D.C. Cir. 2001) (citing RICHARD H. FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 368 (4th ed. 1996)). The federal courts have "presumptive jurisdiction . . .

to inquire into the constitutionality of a jurisdiction-stripping statute." *Belbacha v. Bush*, 520 F.3d 452, 456 (D.C. Cir. 2008).

Mr. Patchak's constitutional challenges to the Gun Lake Act are pure questions of law that we review *de novo*. *See, e.g.*, *Eldred v. Reno*, 239 F.3d 372, 374 (D.C. Cir. 2001).

**A.**

Mr. Patchak first argues that the Gun Lake Act encroaches upon the Article III judicial power of the courts to decide cases and controversies, in violation of well-established constitutional principles of the separation of powers. Article III imbues in the Judiciary "the 'province and duty . . . to say what the law is' in particular cases and controversies." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). This endowment of authority necessarily "blocks Congress from 'requir[ing] federal courts to exercise the judicial power in a manner that Article III forbids.'" *Id.* at 1322-23 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995)).

Congress is generally free to direct district courts to apply newly enacted legislation in pending civil cases. *See Bank Markazi*, 136 S. Ct. at 1325. Without question, "a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts." *Id.* This rule is no different when the newly enacted legislation in question removes the judiciary's authority to review a particular case or class of cases. *See Nat'l Coal. to Save Our Mall*, 269 F.3d at 1096. It is well settled that "Congress has the power (within limits) to tell the courts what classes of cases they may decide." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013). Congress may not, however, "prescribe or

8

superintend how [courts] decide those cases." *Id.* at 1869. Congress impermissibly encroaches upon the judiciary when it "prescribe[s] rules of decision" for a pending case. *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146 (1871). In short, Congress may not direct the result of pending litigation unless it does so by "supply[ing] new law." *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 439 (1992). Mr. Patchak argues that the Gun Lake Act did not provide any new legal standard to apply, but rather impermissibly directed the result of his lawsuit under pre-existing law.

These principles do not require, as Mr. Patchak suggests, that in order to affect pending litigation, Congress must directly amend the substantive laws upon which the suit is based. Indeed, Supreme Court precedent belies such a contention.

In *Seattle Audubon*, for example, the Supreme Court considered the impact of new legislation on pending cases challenging the federal government's efforts to allow the harvesting and sale of old-growth timber in the Pacific Northwest. 503 U.S. at 431. The legislation was the Northwest Timber Compromise, a provision of the Department of the Interior and Related Agencies Appropriations Act, 1990, Pub. L. No. 101-121, § 318, 103 Stat. 745 (1989). *Id.* at 433. It established rules to govern the forest harvesting at issue in the pending consolidated cases, and spoke expressly to those suits – even identifying them by caption number. *Id.* at 433-35. If loggers complied with the new rules, Congress posited, they would thereby satisfy the statutory obligations on which the pending environmental litigation rested. *Id.* The Ninth Circuit held that the Northwest Timber Compromise unconstitutionally dictated the outcome of pending litigation without amending the underlying laws, but the Supreme Court disagreed. The Court

held that the legislation effectively "replaced the legal standards underlying the two original challenges . . . without directing particular applications under either the old or the new standards." *Id.* at 436-37. Because the provision "compelled changes in law," *id.* at 438, the Court concluded that the provision "affected the adjudication of the [specifically identified] cases . . . by effectively modifying the provisions at issue in those cases," *id.* at 440.

The Supreme Court's recent *Bank Markazi* decision likewise applied new legislation to pending litigation. That legislation did not directly amend or modify the particular statute upon which the pending litigation was based. Section 502 of the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, § 502, 126 Stat. 1214, 1258, 22 U.S.C. § 8772 (2012) had been passed in order "[t]o place beyond dispute" the availability of certain assets for satisfaction of judgments rendered in certain specifically identified terrorism cases. *Bank Markazi*, 136 S. Ct. at 1318. The statute was enacted as a freestanding measure, not as an amendment to the Foreign Sovereign Immunities Act of 1976 (FSIA) (which allows American nationals to file suit against state sponsors of terrorism in United States courts, *see* 28 U.S.C. § 1605A), or the Terrorism Risk Insurance Act of 2002 (TRIA) (which authorizes execution of judgments obtained under the FSIA's terrorism exception against "the blocked assets of [a] terrorist party"). *Id.* Rejecting a challenge similar to the one Mr. Patchak pursues here – that the provision "did not simply amend pre-existing law," *id.* at 1325 – the Court held that "§ 8772 changed the law by establishing new substantive standards," *id.* at 1326. As the Court explained, "§ 8772 provides a new standard clarifying that, if Iran owns certain assets, the victims of Iran-sponsored terrorist attacks will be permitted to execute against those assets." *Id.*

Our decision in *National Coalition to Save Our Mall* is also instructive. There, we considered a separation-of-powers challenge to a statute that withdrew from the federal courts subject matter jurisdiction to review challenges to specific executive decisions relating to the placement of the World War II Memorial on the National Mall. 269 F.3d at 1096-97. In rejecting that challenge, we emphasized that there is no "prohibition against Congress's changing the rule of decision in a pending case, or (more narrowly) changing the rule to assure a pro-government outcome." *Id.* at 1096. And while this Court "express[ed] no view" on the question whether a court could do so without amending the substantive law on which a pending claim rested, we did note that the provision at issue (Public Law No. 107-11) "present[ed] no more difficulty than the statute upheld in [*Seattle Audubon*], as Public Law No. 107-11 similarly amend[ed] the applicable substantive law." 269 F.3d at 1097.

Consistent with those decisions, we conclude that the Gun Lake Act has amended the substantive law applicable to Mr. Patchak's claims. That it did so without directly amending or modifying the APA or the IRA is no matter. Through its ratification and confirmation of the Department of the Interior's decision to take the Bradley Property into trust, expressed in Section 2(a), and its clear withdrawal of subject matter jurisdiction in Section 2(b), the Gun Lake Act has "changed the law." *Bank Markazi*, 136 S. Ct. at 1326. More to the point, Section 2(b) provides a new legal standard we are obliged to apply: if an action relates to the Bradley Property, it must promptly be dismissed. Mr. Patchak's suit is just such an action.

That this change has only affected Mr. Patchak's lawsuit does not change our analysis here, for Congress is not limited to enacting generally applicable legislation. Particularized

legislative action is not unconstitutional on that basis alone. *See Bank Markazi*, 136 S. Ct. at 1327-28; *Plaut*, 514 U.S. at 239 n.9; *Nat'l Coal. to Save Our Mall*, 269 F.3d at 1097. "Even laws that impose a duty or liability upon a single individual or firm are not on that account invalid . . . ." *Plaut*, 514 U.S. at 239 n.9.

In passing the Gun Lake Act, Congress exercised its "broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court] ha[s] consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004). Accordingly, we ought to defer to the policy judgment reflected therein. Such is our role. Indeed, "[a]pplying laws implementing Congress' policy judgments, with fidelity to those judgments, is commonplace for the Judiciary." *Bank Markazi*, 136 S. Ct. at 1326.

**B.**

Mr. Patchak next asserts that the Gun Lake Act burdens his First Amendment right to petition. *See* U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."). The Petition Clause "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

The right of access to courts is, without question, "an aspect of the First Amendment right to petition the government." *Id.* (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984)); *see also Cal. Motor Transp. Co. v. Trucking Unltd.,* 404 U.S. 508, 513 (1972). It is an important right, *see Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983), but it is not absolute, *see McDonald v. Smith*, 472

U.S. 479, 484 (1985).  For example, an individual does not have a First Amendment right of access to courts in order to pursue frivolous litigation.  *Id.*  More to the point, the right to access federal courts is subject to Congress's Article III power to define and limit the jurisdiction of the inferior courts of the United States.  *See* U.S. CONST. art. III, § 1; *cf. Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938); *Ameur v. Gates*, 759 F.3d 317, 326 (4th Cir. 2014).  Congress may withhold jurisdiction from inferior federal courts "in the exact degrees and character which to Congress may seem proper for the public good."  *Palmore v. United States*, 411 U.S. 389, 401 (1973) (quoting *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845)).

Moreover, the Gun Lake Act does not foreclose Mr. Patchak's right to petition the government in all forums; it affects only his ability to do so via federal courts.  And while he argues that other forms of petition – such as seeking redress directly from the agency – would be futile, Patchak concedes that he is not entitled to a successful outcome in his petition, or even for the government to listen or respond to his complaints.  Rightfully so.  "Nothing in the First Amendment or in [the Supreme] Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues."  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984); *see also We the People Found., Inc. v. United States*, 485 F.3d 140, 141 (D.C. Cir. 2007).

By stripping federal courts of subject matter jurisdiction over challenges to the status of the Bradley Property, Congress has made its determination as to what is "proper for the public good."  *Palmore*, 411 U.S. at 401 (quoting *Cary*, 44

U.S. (3 How.) at 245). There is no constitutional infirmity here.

## C.

Mr. Patchak also claims that the Gun Lake Act implicates his rights under the Fifth Amendment's Due Process Clause. The Fifth Amendment instructs that the federal government may not deprive individuals of property "without due process of law." U.S. CONST. amend. V. In order to determine whether there has been a violation of due process rights, we undertake a two-part inquiry: first, we must determine whether the claimant was deprived of a protected interest; and second, if the claimant was so deprived, we then consider what process the claimant was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014).

Mr. Patchak identifies a potentially protected property interest in his unadjudicated claim. The Supreme Court has "affirmatively settled" that a cause of action is a species of property requiring due process protection. *Logan*, 455 U.S. at 428 (analyzing due process rights under the Fourteenth Amendment) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). Surely so, as "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Id.* at 430 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978)). Once the legislature confers an interest by statute, it may not constitutionally authorize the deprivation of that interest without implementing appropriate procedural safeguards. *Id.* at 432.

But even assuming that there may be a property right to pursue a cause of action, in a challenge to legislation affecting that very suit, the legislative process provides all the process

that is due. As discussed above, the legislature has the power to change the underlying laws applicable to a case while it is pending and, as a result, to alter the outcome of that case. *See Nat'l Coal. to Save Our Mall*, 269 F.3d at 1096; *see also United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801) (where "a law intervenes and positively changes the rule which governs, the law must be obeyed").

In *Logan*, the Supreme Court acknowledged that "[o]f course," a legislature "remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily-created causes of action altogether—just as it can amend or terminate" benefits programs it has put into place. 455 U.S. at 432; *cf. PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 92 (1980) (Marshall, J., concurring) ("[T]he Due Process Clause does not forbid the 'creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object.'" (quoting *Silver v. Silver*, 280 U.S. 117, 122 (1929))). Indeed, "[n]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." *N.Y. Cent. R.R. Co. v. White*, 243 U.S. 188, 198 (1917). Accordingly, while a cause of action may be a "species of property" that is afforded due process protection, *Logan*, 455 U.S. at 428, there is no deprivation of property without due process when legislation changes a previously existing and still-pending cause of action, *id.* at 432. In such a circumstance, "the legislative determination provides all the process that is due." 455 U.S. at 433.

We have no reason to except the Gun Lake Act from this general approach. Congress made a considered determination to ratify the Department of the Interior's decision to take the Bradley Property into trust for the Gun Lake Tribe, and further to remove any potential impediments to the finality of

that decision. It did not violate Mr. Patchak's due process rights by doing so.

**D.**

Mr. Patchak's final constitutional challenge to the Gun Lake Act is that it constitutes an impermissible Bill of Attainder. *See* U.S. CONST. art. I, § 9, cl. 3. Under this provision, Congress may not "enact[] 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'" *Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). A law is prohibited under the Bill of Attainder Clause if two elements are met: (1) the statute applies with specificity; and (2) the statute imposes punishment. *Id.* at 1217. We are able to resolve Mr. Patchak's challenge on the second element alone, because the Gun Lake Act is not punitive.

In order to decide whether a statute impermissibly inflicts punishment, we consider each case in "its own highly particularized context." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852 (1984) (quoting *Flemming v. Nestor*, 363 U.S. 603, 616 (1960)). In so doing, we pursue a three-part inquiry:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'

*Id.* (quoting *Nixon*, 433 U.S. at 475-76, 478). These factors are considered independently, and are weighed together to resolve a bill of attainder claim. *See Foretich*, 351 F.3d at 1218. None of the three factors is necessarily dispositive, but this Court has noted that the second factor – what is called the "functional test" – "invariably appears to be the most important of the three." *Id.* (quoting *BellSouth Corp. v. FCC*, 162 F.3d 678, 684 (D.C. Cir. 1998)).

Historically, laws invalidated as bills of attainder "offer[ed] a ready checklist of deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of [Article] I, § 9." *Nixon*, 433 U.S. at 473. "This checklist includes sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions." *Foretich*, 351 F.3d at 1218. Jurisdictional limitations are generally not of this type. *See Ameur*, 759 F.3d at 329 ("[J]urisdictional limits are usually not viewed as traditional 'punishment.'"); *Hamad v. Gates,* 732 F.3d 990, 1004 (9th Cir. 2013) ("Jurisdictional limitations . . . do not fall within the historical meaning of legislative punishment."); *see also Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 n.9 (11th Cir. 2008) (declining to find that a "generally applicable jurisdictional rule" amounted to a bill of attainder in part because it "d[id] not impose punishment of any kind"); *Nagac v. Derwinski*, 933 F.2d 990, 991 (Fed. Cir. 1991) (jurisdictional limitation "d[id] not impose a punishment 'traditionally adjudged to be prohibited by the Bill of Attainder Clause'" (quoting *Nixon*, 433 U.S. at 475)).

The second prong of the inquiry, the "functional test," requires that the legislation have "a legitimate nonpunitive purpose" and that there is "a rational connection between the burden imposed and [the] nonpunitive purposes." *Foretich*,

351 F.3d at 1220-21. In other words, the means employed by the statute must be rationally designed to meet its legitimate nonpunitive goals.

The Gun Lake Act passes this test. The Gun Lake Act serves the legitimate nonpunitive purpose of "provid[ing] certainty to the legal status of the [Bradley Property], on which the Tribe has begun gaming operations as a means of economic development for its community." S. REP. NO. 113-194, at 2 (2014). Congress accomplished this goal by affirming and ratifying the Department of the Interior's initial decision to put the land into trust for the Tribe in Section 2(a), but also by removing jurisdiction over matters relating to the land in Section 2(b). In point of fact, Congress's intended goal of providing certainty with respect to the trust land would have been impossible to achieve absent the termination of any outstanding litigation – specifically, Mr. Patchak's suit. The legislative history reflects an acknowledgement of this fact, noting that Mr. Patchak's suit "places in jeopardy the Tribe's only tract of land held in trust and the economic development project that the Tribe is currently operating on the land." *Id.* Whatever burden is imposed by Section 2(b), on Mr. Patchak or otherwise, the statute is rationally designed to meet its legitimate, nonpunitive purpose of providing certainty with respect to the trust land.

Finally, the legislative record does not evince a congressional intent to punish. Mr. Patchak has presented no evidence, other than the acknowledgement that his case would be affected, for his claim that Congress purposefully targeted him for retaliation through the Gun Lake Act. While it may be true that Mr. Patchak was adversely affected as a result of the legislation, the record does not show that Congress acted with any punitive or retaliatory intent.

**E.**

The Government suggests that there is an alternative ground on which we could rule, arguing that the Gun Lake Act provides an exemption to the APA's waiver of sovereign immunity. While the Government did not make this argument in the proceedings below, sovereign immunity is a threshold jurisdictional question that speaks to the court's authority to hear a given case, and so we would be well within bounds to consider the question. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Indeed, the 'terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Nevertheless, because we conclude that the Gun Lake Act is not constitutionally infirm, and that subject matter jurisdiction over Mr. Patchak's claim has thus validly been withdrawn, we need not consider the matter further.

**III.**

In a separate challenge to the proceedings below, Mr. Patchak contends that the District Court erred by permitting the administrative record to be supplemented. We review the District Court's denial of Mr. Patchak's Motion to Strike the Administrative Record Supplement for abuse of discretion. *Cf. Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

Although this case may not present circumstances typically permitting the agency to supplement the record, *see id.*, the District Court's failure to strike the supplemental information provided to it was not an abuse of discretion. The District Court denied Mr. Patchak's Motion to Strike Supplemental Record "[f]or the reasons set forth in the Memorandum Opinion" entered on the same date, *see* Order,

*Patchak v. Jewell*, Civil Action No. 08-1331 (RJL), Docket No. 93 (D.D.C. June 17, 2015) – *i.e.*, the District Court's determination, at issue in this appeal, that it was without jurisdiction to consider the suit and that the case was to be dismissed in its entirety, *Patchak v. Jewell*, 109 F. Supp. 3d 152 (D.D.C. 2015). The District Court only mentioned the record supplement in the Procedural Background section of its opinion in order to indicate the "events [that] have altered the legal landscape" in the time since the case was remanded from the Supreme Court. *Id.* at 158. The District Court did not abuse its discretion by referencing that development in this way. Nor did it abuse its discretion by denying a motion to strike a supplement to the record at the same time that it was dismissing the case in its entirety for lack of jurisdiction.

## IV.

For the foregoing reasons, the District Court's decisions below are affirmed.

*So ordered.*