(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PATCHAK *v.* ZINKE, SECRETARY OF THE INTERIOR, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 16–498. Argued November 7, 2017—Decided February 27, 2018

Petitioner David Patchak filed suit challenging the authority of the Secretary of the Interior to invoke the Indian Reorganization Act, 25 U. S. C. §5108, and take into trust a property (Bradley Property) on which respondent Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians wished to build a casino. In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U. S. 209 (*Patchak I*), this Court held that the Secretary lacked sovereign immunity and that Patchak had standing, and it remanded the case for further proceedings. While the suit was back in District Court, Congress enacted the Gun Lake Act, 128 Stat. 1913, which "reaffirmed as trust land" the Bradley Property, §2(a), and provided that "an action . . . relating to [that] land shall not be filed or maintained in a Federal court and shall be promptly dismissed," §2(b). In response, the District Court dismissed Patchak's suit, and the D. C. Circuit affirmed.

*Held*: The judgment is affirmed.

828 F. 3d 995, affirmed.

JUSTICE THOMAS, joined by JUSTICE BREYER, JUSTICE ALITO, and JUSTICE KAGAN, concluded that §2(b) of the Gun Lake Act does not violate Article III of the Constitution. Pp. 4–16.

(a) Congress may not exercise the judicial power, see *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218, but the legislative power permits Congress to make laws that apply retroactively to pending lawsuits, even when it effectively ensures that one side will win, *Bank Markazi* v. *Peterson*, 578 U. S. ___, ___–___. Permissible exercises of the legislative power and impermissible infringements of the judicial power are distinguished by the following rule: Congress vio-

lates Article III when it "compel[s] . . . findings or results under old law," *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 438, but not when it "changes the law," *Plaut, supra*, at 218. Pp. 4–6.

(b) By stripping federal courts of jurisdiction over actions "relating to" the Bradley Property, §2(b) changes the law. Pp. 6–10.

(1) Section 2(b) is best read as a jurisdiction-stripping statute. It uses jurisdictional language, imposes jurisdictional consequences, and applies "[n]otwithstanding any other provision of law," including the general grant of federal-question jurisdiction, 28 U. S. C. §1331. And while §2(b) does not use the word "jurisdiction," jurisdictional statutes are not required to do so. See *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153. Indeed, §2(b) uses language similar to language used in other jurisdictional statutes. See, *e.g., Gonzalez* v. *Thaler*, 565 U. S. 134, 142. And §2(b) cannot plausibly be read as anything other than jurisdictional. Pp. 6–7.

(2) When Congress strips federal courts of jurisdiction, it exercises a valid legislative power. This Court has held that Congress generally does not violate Article III when it strips federal jurisdiction over a class of cases, see *Ex parte McCardle*, 7 Wall. 506, 514, and has reaffirmed these principles on many occasions, see, *e.g.*, *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95. Pp. 7–10.

(b) Patchak's two arguments for why §2(b) violates Article III even if it does strip jurisdiction—that the provision flatly directs federal courts to dismiss lawsuits without allowing them to interpret or apply any new law, and that it attempts to interfere with this Court's decision in *Patchak I* that his suit "may proceed," 567 U. S., at 212— are unpersuasive. Pp. 10–15.

JUSTICE GINSBURG, joined by JUSTICE SOTOMAYOR, concluded that Congress' authority to forgo or retain the Government's sovereign immunity from suit suffices to decide this case. With *Patchak I* in mind, Congress acted effectively to displace the Administrative Procedure Act's waiver of immunity for suits against the United States— which enabled Patchak to launch this litigation—with a contrary command applicable to the Bradley Property. Pp. 1–2.

JUSTICE SOTOMAYOR concluded that §2(b) of the Gun Lake Act is most naturally read as having restored the Federal Government's sovereign immunity from Patchak's suit challenging the trust status of the Bradley Property. Pp. 1–2.

THOMAS, J., announced the judgment of the Court and delivered an opinion, in which BREYER, ALITO, and KAGAN, JJ., joined. BREYER, J., filed a concurring opinion. GINSBURG, J., filed an opinion concurring in the judgment, in which SOTOMAYOR, J., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment. ROBERTS, C. J., filed a dissenting opinion, in which KENNEDY and GORSUCH, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–498

DAVID PATCHAK, PETITIONER *v.* RYAN ZINKE, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2018]

JUSTICE THOMAS announced the judgment of the Court and delivered an opinion, in which JUSTICE BREYER, JUSTICE ALITO, and JUSTICE KAGAN join.

Petitioner, David Patchak, sued the Secretary of the Interior for taking land into trust on behalf of an Indian Tribe. While his suit was pending in the District Court, Congress enacted the Gun Lake Trust Land Reaffirmation Act (Gun Lake Act or Act), Pub. L. 113–179, 128 Stat. 1913, which provides that suits relating to the land "shall not be filed or maintained in a Federal court and shall be promptly dismissed." Patchak contends that, in enacting this statute, Congress impermissibly infringed the judicial power that Article III of the Constitution vests exclusively in the Judicial Branch. Because we disagree, we affirm the judgment of the United States Court of Appeals for the District of Columbia Circuit.

## I

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Band) resides in southwestern Michigan, near the township of Wayland. The Band traces its relationship with the United States back hundreds of years, point-

ing to treaties it negotiated with the Federal Government as early as 1795. But the Secretary of the Interior did not formally recognize the Band until 1999. See 63 Fed. Reg. 56936 (1998); 65 Fed. Reg. 13298 (2000).

After obtaining formal recognition, the Band identified a 147-acre parcel of land in Wayland, known as the Bradley Property, where it wanted to build a casino. The Band asked the Secretary to invoke the Indian Reorganization Act, §5, 48 Stat. 985, 25 U. S. C. §5108, and take the Bradley Property into trust.[1] In 2005, the Secretary agreed and posted a notice informing the public that the Bradley Property would be taken into trust for the Band. See 70 Fed. Reg. 25596 (2005).

The Michigan Gambling Opposition (MichGO) sued, alleging that the Secretary's decision violated federal environmental and gaming laws. After several years of litigation, the D. C. Circuit affirmed the dismissal of MichGo's claims, and this Court denied certiorari. *Michigan Gambling Opposition* v. *Kempthorne*, 525 F. 3d 23 (2008), cert. denied, 555 U. S. 1137 (2009). In January 2009, the Secretary formally took the Bradley Property into trust. And in February 2011, the Band opened its casino.

Before the Secretary formally took the land into trust, a nearby landowner, David Patchak, filed another lawsuit challenging the Secretary's decision. Invoking the Administrative Procedure Act, 5 U. S. C. §§702, 706(2), Patchak alleged that the Secretary lacked statutory authority to take the Bradley Property into trust for the Band. The Indian Reorganization Act does not allow the Secretary to take land into trust for tribes that were not under federal

---

[1] Federal law allows Indian tribes to operate casinos on "Indian lands," 25 U. S. C. §2710, which includes lands "held in trust by the United States for the benefit of any Indian tribe," §2703(4)(B).

jurisdiction when the statute was enacted in 1934. See *Carcieri* v. *Salazar*, 555 U. S. 379, 382–383 (2009). The Band was not federally recognized until 1999, which Patchak argued was more than 65 years too late. Based on this alleged statutory violation, Patchak sought to reverse the Secretary's decision to take the Bradley Property into trust.

The Secretary raised preliminary objections to Patchak's suit, contending that it was barred by sovereign immunity and that Patchak lacked prudential standing to bring it. The District Court granted the Secretary's motion to dismiss, but the D. C. Circuit reversed. *Patchak* v. *Salazar*, 646 F. Supp. 2d 72 (DC 2009), rev'd, 632 F. 3d 702 (2011). This Court granted certiorari and affirmed the D. C. Circuit. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U. S. 209 (2012) (*Patchak I*). This Court's decision in *Patchak I* held that Congress had waived the Secretary's sovereign immunity from suits like Patchak's. *Id.,* at 215–224. It also held that Patchak had prudential standing because his suit arguably fell within the "zone of interests" protected by the Indian Reorganization Act. *Id.,* at 224–228. Because Patchak had standing and the Secretary lacked immunity, this Court concluded that "Patchak's suit may proceed," *id.,* at 212, and remanded for further proceedings, *id.,* at 228.

In September 2014, while Patchak's suit was back in the District Court, Congress enacted the Gun Lake Act, 128 Stat. 1913. Section 2(a) of the Act states that the Bradley Property "is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed." Section 2(b) then provides the following:

"NO CLAIMS.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) re-

lating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed."

Based on §2(b), the District Court entered summary judgment against Patchak and dismissed his suit for lack of jurisdiction. 109 F. Supp. 3d 152 (DC 2015).

The D. C. Circuit affirmed. *Patchak* v. *Jewell*, 828 F. 3d 995 (2016). It held that "[t]he language of the Gun Lake Act makes plain that Congress has stripped federal courts of subject matter jurisdiction" over suits, like Patchak's, that relate to the Bradley Property. *Id.,* at 1001. The D. C. Circuit rejected Patchak's argument that §2(b) violates Article III of the Constitution. *Id.,* at 1001–1003. Article III prohibits Congress from "direct[ing] the result of pending litigation," the D. C. Circuit reasoned, but it does not prohibit Congress from "'supply[ing] new law.'" *Id.,* at 1002 (quoting *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 439 (1992)). Section 2(b) supplies new law: "[I]f an action relates to the Bradley Property, it must promptly be dismissed." 828 F. 3d, at 1003.

We granted certiorari to review whether §2(b) violates Article III of the Constitution.[2] See 581 U. S. ___ (2017). Because it does not, we now affirm.

## II

### A

The Constitution creates three branches of Government and vests each branch with a different type of power. See Art. I, §1; Art. II, §1, cl. 1; Art. III, §1. "To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the

––––––––

[2] Patchak does not challenge the constitutionality of §2(a) of the Gun Lake Act. See Reply Brief 7; Tr. of Oral Arg. 5. We thus limit our analysis to §2(b).

judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923); see also *Wayman* v. *Southard*, 10 Wheat. 1, 46 (1825) (Marshall, C. J.) ("[T]he legislature makes, the executive executes, and the judiciary construes the law"). By vesting each branch with an exclusive form of power, the Framers kept those powers separate. See *INS* v. *Chadha*, 462 U. S. 919, 946 (1983). Each branch "exercise[s] . . . the powers appropriate to its own department," and no branch can "encroach upon the powers confided to the others." *Kilbourn* v. *Thompson*, 103 U. S. 168, 191 (1881). This system prevents "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands," The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) (J. Madison)—an accumulation that would pose an inherent "threat to liberty," *Clinton* v. *City of New York*, 524 U. S. 417, 450 (1998) (KENNEDY, J., concurring).

The separation of powers, among other things, prevents Congress from exercising the judicial power. See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218 (1995). One way that Congress can cross the line from legislative power to judicial power is by "usurp[ing] a court's power to interpret and apply the law to the [circumstances] before it." *Bank Markazi* v. *Peterson*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 12). The simplest example would be a statute that says, "In *Smith* v. *Jones*, Smith wins." See *id.,* at \_\_\_–\_\_\_, n. 17 (slip op., at 12–13, n. 17). At the same time, the legislative power is the power to make law, and Congress can make laws that apply retroactively to pending lawsuits, even when it effectively ensures that one side wins. See *id.,* at \_\_\_–\_\_\_ (slip op., at 15–19).

To distinguish between permissible exercises of the legislative power and impermissible infringements of the judicial power, this Court's precedents establish the following rule: Congress violates Article III when it "com-

pel[s] . . . findings or results under old law." *Seattle Audubon*, *supra*, at 438. But Congress does not violate Article III when it "changes the law." *Plaut*, *supra*, at 218.

## B

Section 2(b) changes the law. Specifically, it strips federal courts of jurisdiction over actions "relating to" the Bradley Property. Before the Gun Lake Act, federal courts had jurisdiction to hear these actions. See 28 U. S. C. §1331. Now they do not. This kind of legal change is well within Congress' authority and does not violate Article III.

### 1

Section 2(b) strips federal jurisdiction over suits relating to the Bradley Property. The statute uses jurisdictional language. It states that an "action" relating to the Bradley Property "shall not be filed or maintained in a Federal court." It imposes jurisdictional consequences: Actions relating to the Bradley Property "shall be promptly dismissed." See *Ex parte McCardle*, 7 Wall. 506, 514 (1869) ("[W]hen [jurisdiction] ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause"). Section 2(b) has no exceptions. Cf. *Reed Elsevier, Inc.* v. *Muchnick*, 559 U. S. 154, 165 (2010). And it applies "[n]otwithstanding any other provision of law," including the general grant of federal-question jurisdiction, 28 U. S. C. §1331. Although §2(b) does not use the word "jurisdiction," this Court does not require jurisdictional statutes to "incant magic words." *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013). Indeed, §2(b) uses language similar to other statutes that this Court has deemed jurisdictional. See, *e.g.*, *Gonzalez* v. *Thaler*, 565 U. S. 134, 142 (2012) ("'an appeal may not be taken'" (quoting 28 U. S. C. §2253(c)(1))); *Keene Corp.* v. *United States*, 508 U. S. 200, 208–209 (1993) ("'[n]o person shall file or prosecute'" (quoting 36 Stat. 1138)); *Wein-*

*berger* v. *Salfi*, 422 U. S. 749, 756 (1975) ("'[n]o action . . . shall be brought under [28 U. S. C. §1331]'" (quoting 42 U. S. C. §405(h))).

Our conclusion that §2(b) is jurisdictional is bolstered by the fact that it cannot plausibly be read as anything else. Section 2(b) is not one of the nonjurisdictional rules that this Court's precedents have identified as "important and mandatory" but not governing "a court's adjudicatory capacity." *Henderson* v. *Shinseki*, 562 U. S. 428, 435 (2011). Section 2(b) does not identify an "element of [the] plaintiff's claim for relief" or otherwise define its "substantive adequacy." *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 516, 504 (2006). Nor is it a "claim-processing rule," like a filing deadline or an exhaustion requirement, that requires the parties to "take certain procedural steps at certain specified times." *Henderson*, *supra*, at 435. Instead, §2(b) completely prohibits actions relating to the Bradley Property. Because §2(b) addresses "a court's competence to adjudicate a particular category of cases," *Wachovia Bank, N. A.* v. *Schmidt*, 546 U. S. 303, 316 (2006), it is best read as a jurisdiction-stripping statute.

2

Statutes that strip jurisdiction "chang[e] the law" for the purpose of Article III, *Plaut*, *supra*, at 218, just as much as other exercises of Congress' legislative authority. Article I permits Congress "[t]o constitute Tribunals inferior to the supreme Court," §8, and Article III vests the judicial power "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," §1. These provisions reflect the so-called Madisonian Compromise, which resolved the Framers' disagreement about creating lower federal courts by leaving that decision to Congress. See *Printz* v. *United States*, 521 U. S. 898, 907 (1997); 1 Records of the Federal Convention of 1787, p. 125 (M. Farrand ed. 1911). Congress' greater

power to create lower federal courts includes its lesser power to "limit the jurisdiction of those Courts." *United States* v. *Hudson*, 7 Cranch 32, 33 (1812); accord, *Lockerty* v. *Phillips*, 319 U. S. 182, 187 (1943). So long as Congress does not violate other constitutional provisions, its "control over the jurisdiction of the federal courts" is "plenary." *Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50, 63–64 (1944); see also *Bowles* v. *Russell*, 551 U. S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider"). Thus, when Congress strips federal courts of jurisdiction, it exercises a valid legislative power no less than when it lays taxes, coins money, declares war, or invokes any other power that the Constitution grants it.

Indeed, this Court has held that Congress generally does not violate Article III when it strips federal jurisdiction over a class of cases.[3] Shortly after the Civil War, for example, Congress repealed this Court's appellate jurisdiction over certain habeas corpus cases. See Act of Mar. 27, 1868, ch. 34, §2, 15 Stat. 44; see also U. S. Const., Art. III, §2 (permitting Congress to make "Exceptions" to this Court's appellate jurisdiction). William McCardle, a military prisoner whose appeal was pending at the time, argued that the repealing statute was "an exercise by the Congress of judicial power." 7 Wall., at 510. This Court disagreed. Jurisdiction-stripping statutes, the Court explained, do not involve "the exercise of judicial power" or "legislative interference with courts in the exercising of continuing jurisdiction." *Id.,* at 514. Because jurisdiction

---

[3] Jurisdiction-stripping statutes can violate other provisions of the Constitution. And, under our precedents, jurisdiction-stripping statutes can violate Article III if they "attemp[t] to direct the result" by effectively altering legal standards that Congress is "powerless to prescribe." *Bank Markazi* v. *Peterson*, 578 U. S. ___, ___ (2016) (slip op., at 15) (citing *United States* v. *Klein*, 13 Wall. 128, 146–147 (1872)).

is the "power to declare the law" in the first place, "judicial
duty is not less fitly performed by declining ungranted
jurisdiction than in exercising firmly that which the Con-
stitution and the laws confer." *Id.,* at 514–515.[4]

This Court has reaffirmed these principles on many
occasions. Congress generally does not infringe the judi-
cial power when it strips jurisdiction because, with limited
exceptions, a congressional grant of jurisdiction is a *pre-
requisite* to the exercise of judicial power. See *Steel Co.* v.
*Citizens for Better Environment,* 523 U. S. 83, 94–95
(1998) ("The requirement that jurisdiction be established

---

[4] The dissent appears to disagree with *McCardle,* questions the mo-
tives of the unanimous Court that decided it, asserts that it is "incon-
sistent" with *Klein,* and distinguishes it on the ground that the statute
there "did not foreclose all avenues of judicial review." *Post,* at 12–13
(opinion of ROBERTS, C. J.). But the core holding of *McCardle*—that
Congress does not exercise the judicial power when it strips jurisdiction
over a class of cases—has never been questioned, has been repeatedly
reaffirmed, and was reaffirmed in *Klein* itself. See 13 Wall., at 145
("[T]here could be no doubt" that Congress can "den[y] the right of
appeal in a particular class of cases"). And if there is any inconsistency
between the two, this Court has said that it is *Klein*—not *McCardle*—
that "cannot [be] take[n] . . . 'at face value.'" *Bank Markazi,* 578 U. S.,
at \_\_\_ (slip op., at 15) (quoting R. Fallon, J. Manning, D. Meltzer, & D.
Shapiro, Hart and Wechsler's The Federal Courts and the Federal
System 324 (7th ed. 2015)). Moreover, it is true that *McCardle* empha-
sized that the statute there did not withdraw "the whole appellate
power of the court, *in cases of habeas corpus.*" 7 Wall., at 515 (empha-
sis added). But *McCardle*'s reservation, this Court later explained, was
responding to a potential problem under the Suspension Clause, not a
potential problem under Article III. See *Ex parte Yerger,* 8 Wall. 85,
102–103 (1869) ("We agree that [jurisdiction] is given subject to excep-
tion and regulation by Congress; but it is too plain for argument that
the denial to this court of appellate jurisdiction in this class of cases
must greatly weaken the efficacy of the writ"); *id.,* at 96 ("It would have
been . . . a remarkable anomaly if this court . . . had been denied, under
a constitution which absolutely prohibits suspension of the writ, except
under extraordinary exigencies, that power in cases of alleged unlawful
restraint").

as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States'" (quoting *Mansfield, C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379, 382 (1884))); *Cary* v. *Curtis*, 3 How. 236, 245 (1845) ("[T]he judicial power of the United States . . . is (except in enumerated instances, applicable exclusively to this court) dependent . . . entirely upon the action of Congress"); *Hudson*, *supra*, at 33 (similar). "To deny this position" would undermine the separation of powers by "elevat[ing] the judicial over the legislative branch." *Cary*, *supra*, at 245. Congress' power over federal jurisdiction is "an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects." *Steel Co.*, *supra*, at 101.

In sum, §2(b) strips jurisdiction over suits relating to the Bradley Property. It is a valid exercise of Congress' legislative power. And because it changes the law, it does not infringe the judicial power. The constitutionality of jurisdiction-stripping statutes like this one is well established.

## III

Patchak does not dispute Congress' power to withdraw jurisdiction from the federal courts. He instead raises two arguments why §2(b) violates Article III, even if it strips jurisdiction. First, relying on *United States* v. *Klein*, 13 Wall. 128 (1872), Patchak argues that §2(b) flatly directs federal courts to dismiss lawsuits without allowing them to interpret or apply any new law. Second, relying on *Plaut*, 514 U. S. 211, Patchak argues that §2(b) attempts to interfere with this Court's decision in *Patchak I*—specifically, its conclusion that his suit "may proceed," 567 U. S., at 212. We reject both arguments.

A

Section 2(b) does not flatly direct federal courts to dismiss lawsuits under old law. It creates new law for suits relating to the Bradley Property, and the District Court interpreted and applied that new law in Patchak's suit. Section 2(b)'s "relating to" standard effectively guaranteed that Patchak's suit would be dismissed. But "a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts." *Bank Markazi*, 578 U. S., at \_\_\_ (slip op., at 17). "[I]t is not any the less a case or controversy upon which a court possessing the federal judicial power may rightly give judgment" when the arguments before the court are "uncontested or incontestable." *Pope* v. *United States*, 323 U. S. 1, 11 (1944).

Patchak argues that the last four words of §2(b)—"shall be promptly dismissed"—direct courts to reach a particular outcome. But a statute does not violate Article III merely because it uses mandatory language. See *Seattle Audubon*, 503 U. S., at 439. Instead of directing outcomes, the mandatory language in §2(b) "simply imposes the consequences" of a court's determination that it lacks jurisdiction because a suit relates to the Bradley Property. *Miller* v. *French*, 530 U. S. 327, 349 (2000); see *McCardle*, 7 Wall., at 514.[5]

Patchak compares §2(b) to the statute this Court held unconstitutional in *Klein*. In that case, the administrator

───────────

[5] To prove that it does not change the law, Patchak repeatedly asserts that §2(b) does not amend any "generally applicable" statute. Brief for Petitioner 11; Reply Brief 1, 4, 9. But this Court rejected that same argument in *Seattle Audubon*. Congress can change a law "directly," or it can change a law indirectly by passing "an entirely separate statute." 503 U. S., at 439–440. Either way, it changes the law. The same is true for jurisdictional statutes. See *Insurance Co.* v. *Ritchie*, 5 Wall. 541 (1867).

of the estate of V. F. Wilson, a former Confederate soldier, sued to recover the value of some cotton that the Government had seized during the war. 13 Wall., at 132. The relevant statute required claimants to prove their loyalty in order to reclaim their property. Ch. 120, §3, 12 Stat. 820. Wilson had received a pardon before he died, 13 Wall., at 132, and this Court had held that pardons conclusively prove loyalty under the statute, see *United States* v. *Padelford*, 9 Wall. 531, 543 (1870). But after Wilson's administrator secured a judgment in his favor, 13 Wall., at 132, Congress passed a statute making pardons proof of disloyalty and declaring that, if a claimant had accepted one, "the jurisdiction of the court in the case shall cease, and the court shall forthwith dismiss the suit of such claimant." Act of July 12, 1870, 16 Stat. 235. If the court had already entered judgment in favor of a pardoned claimant and the Government had appealed, the statute instructed this Court to dismiss the whole suit for lack of jurisdiction. See *ibid.* *Klein* held that this statute infringed the executive power by attempting to "change the effect of . . . a pardon." *Id.,* at 148. *Klein* also held that the statute infringed the judicial power, see *id.,* at 147, although its reasons for this latter holding were not entirely clear.

This Court has since explained that "the statute in *Klein* infringed the judicial power, not because it left too little for courts to do, but because it attempted to direct the result without altering the legal standards governing the effect of a pardon—standards Congress was powerless to prescribe." *Bank Markazi, supra,* at ___ (slip op., at 15). Congress had no authority to declare that pardons are not evidence of loyalty, so it could not achieve the same result by stripping jurisdiction whenever claimants cited pardons as evidence of loyalty. See *Klein*, 13 Wall., at 147–148. Nor could Congress confer jurisdiction to a federal court but then strip jurisdiction from that same court once the

court concluded that a pardoned claimant should prevail under the statute. See *id.,* at 146–147.

Patchak's attempts to compare §2(b) to the statute in *Klein* are unpersuasive. Section 2(b) does not attempt to exercise a power that the Constitution vests in another branch. And unlike the selective jurisdiction-stripping statute in *Klein*, §2(b) strips jurisdiction over every suit relating to the Bradley Property. Indeed, *Klein* itself explained that statutes that do "nothing more" than strip jurisdiction over "a particular class of cases" are constitutional. *Id.*, at 145. That is precisely what §2(b) does.

## B

Section 2(b) does not unconstitutionally interfere with this Court's decision in *Patchak I*. Article III, this Court explained in *Plaut*, prohibits Congress from "retroactively commanding the federal courts to reopen final judgments." 514 U. S., at 219. But *Patchak I* did not finally conclude Patchak's case. See *Bradley* v. *School Bd. of Richmond*, 416 U. S. 696, 711, n. 14 (1974). When this Court said that his suit "may proceed," 567 U. S., at 212, it meant that the Secretary's preliminary defenses lacked merit and that Patchak could return to the District Court for further proceedings. It did not mean that Congress was powerless to change the law that governs his case. As this Court emphasized in *Plaut*, Article III does not prohibit Congress from enacting new laws that apply to pending civil cases. See 514 U. S., at 226–227. When a new law clearly governs pending cases, Article III does not prevent courts from applying it because "each court, at every level, must 'decide according to existing laws.'" *Ibid.* (quoting *United States* v. *Schooner Peggy*, 1 Cranch 103, 109 (1801)). This principle applies equally to statutes that strip jurisdiction. See *Landgraf* v. *USI Film Products*, 511 U. S. 244, 274 (1994); *Kline* v. *Burke Constr. Co.*, 260 U. S. 226, 234 (1922); *Hallowell* v. *Commons*, 239 U. S. 506, 509 (1916).

Because §2(b) expressly references "pending" cases, it
applies to Patchak's suit. And because Patchak's suit is
not final, applying §2(b) here does not offend Article III.[6]

Of course, we recognize that the Gun Lake Act was a
response to this Court's decision in *Patchak I*. The text of
the Act, after all, cites both the administrative decision
and the property at issue in that case. See §§2(a)–(b).
And we understand why Patchak would view the Gun
Lake Act as unfair. By all accounts, the Band exercised
its political influence to persuade Congress to enact a
narrow jurisdiction-stripping provision that effectively
ends all lawsuits threatening its casino, including
Patchak's.

But the question in this case is "[n]ot favoritism, nor
even corruption, but *power*." *Plaut*, *supra*, at 228; see also
*McCardle*, 7 Wall., at 514 ("We are not at liberty to inquire
into the motives of the legislature. We can only examine
into its power under the Constitution"). Under this
Court's precedents, Congress has the power to "apply
newly enacted, outcome-altering legislation in pending
civil cases," *Bank Markazi*, 578 U. S., at ___ (slip op., at
16), even when the legislation "govern[s] one or a very
small number of specific subjects," *id.*, at ___ (slip op., at
21). For example, this Court has upheld narrow statutes
that identified specific cases by caption and docket num-
ber in their text. See *id.,* at ___ (slip op., at 19); *Seattle
Audubon*, 503 U. S., at 440. And this Court has approv-
ingly cited a D. C. Circuit decision, which upheld a statute
that retroactively stripped jurisdiction over suits challeng-
ing "a single memorial." *Bank Markazi*, *supra,* at ___ (slip

––––––––––

[6] Retroactive legislation can violate other provisions of the Constitu-
tion, such as the *Ex Post Facto* Clause and the Bills of Attainder
Clause. See *Bank Markazi*, 578 U. S., at ___ (slip op., at 16). But
Patchak's Article III claim is the only challenge to §2(b) before us.

op., at 22) (citing *National Coalition To Save Our Mall* v. *Norton*, 269 F. 3d 1092 (2001)). If these targeted statutes did not cross the line from legislative to judicial power, then §2(b) does not either.

## IV

The dissent offers a different theory for why §2(b) violates Article III. A statute impermissibly exercises the judicial power, the dissent contends, when it "targets" a particular suit and "manipulates" jurisdiction to direct the outcome, "practical[ly] operat[es]" to affect only one suit, and announces a legal standard that does not "imply some measure of generality" or "preserv[e] . . . an adjudicative role for the courts." *Post*, at 8, 11.

We doubt that the constitutional line separating the legislative and judicial powers turns on factors such as a court's doubts about Congress' unexpressed motives, the number of "cases [that] were pending when the provision was enacted," or the time left on the statute of limitations. *Post*, at 8. But even if it did, we disagree with the dissent's characterization of §2(b). Nothing on the face of §2(b) is limited to Patchak's case, or even to his challenge under the Indian Reorganization Act. Instead, the text extends to all suits "relating to" the Bradley Property. Thus, §2(b) survives even under the dissent's theory: It "prospectively govern[s] an open-ended class of disputes," *post,* at 6, and its "relating to" standard "preserv[es] . . . an adjudicative role for the courts," *post*, at 11. While §2(b)'s "relating to" standard is not difficult to interpret or apply, this Court's precedents *encourage* Congress to draft jurisdictional statutes in this manner. See *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94 (2010) ("[A]dministrative simplicity is a major virtue in a jurisdictional statute. . . . [C]ourts benefit from straightforward rules under which they can

readily assure themselves of their power to hear a case").[7]

*      *      *

We conclude that §2(b) of the Gun Lake Act does not violate Article III of the Constitution. The judgment of the Court of Appeals is, therefore, affirmed.

*It is so ordered.*

—————

[7] We also doubt that the statute this Court upheld in *Bank Markazi* would survive under the dissent's theory. The dissent notes that the statute there affected "16 different actions," while the statute here affects "a single pending case." *Post*, at 8. But if the problem is Congress "pick[ing] winners and losers in pending litigation," *post*, at 14, then it seems backwards to conclude that Congress is on *stronger* constitutional footing when it picks winners and losers in *more* pending cases.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–498

_____

## DAVID PATCHAK, PETITIONER *v.* RYAN ZINKE, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2018]

JUSTICE BREYER, concurring.

The statutory context makes clear that this is not simply a case in which Congress has said, "In *Smith* v. *Jones*, Smith wins." See *post,* at 1, 11–12 (ROBERTS, C. J., dissenting). In 2005, the Secretary of the Interior announced her decision to take the Bradley Property into trust for an Indian Tribe, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians. See 70 Fed. Reg. 25596 (2005). The petitioner brought suit, claiming that the Secretary lacked the statutory authority to do so. See *Carcieri* v. *Salazar*, 555 U. S. 379, 382 (2009) (the Indian Reorganization Act gives the Secretary authority to take land into trust only for a tribe under federal jurisdiction in 1934).

Congress then enacted the law here at issue. Gun Lake Trust Land Reaffirmation Act, Pub. L. 113–179, 128 Stat. 1913. (I have placed the full text of that law in the Appendix, *infra*.) The first part "reaffirm[s]," "ratifie[s]," and "confirm[s]" the Secretary's "actions in taking" the Bradley Property "into trust," as well as the status of the Bradley Property "as trust land." §2(a). The second part says that actions "relating to" the Bradley Property "shall not be filed or maintained in a Federal court and shall be promptly dismissed." §2(b). Read together, Congress first made certain that federal statutes gave the Secretary the authority to take the Bradley Property into trust, and

second tried to dot all the i's by adding that federal courts shall not hear cases challenging the land's trust status. The second part, the jurisdictional part, perhaps gilds the lily, perhaps simplifies judicial decisionmaking (the judge need only determine whether a lawsuit relates to the Bradley Property), but, read in context, it does no more than provide an alternative legal standard for courts to apply that seeks the same real-world result as does the first part: The Bradley Property shall remain in trust.

The petitioner does not argue that Congress acted unconstitutionally by ratifying the Secretary's actions and the land's trust status, and I am aware of no substantial argument to that effect. See *United States* v. *Heinszen & Co.*, 206 U. S. 370, 382–383, 387 (1907) (Congress may retroactively ratify Government action that was unauthorized when taken); Brief for Federal Courts and Federal Indian Law Scholars as *Amici Curiae* 6–11 (citing numerous examples of tribe-specific Indian-land bills). The jurisdictional part of the statute therefore need not be read to do more than eliminate the cost of litigating a lawsuit that will inevitably uphold the land's trust status.

This case is consequently unlike *United States* v. *Klein*, 13 Wall. 128 (1872), where this Court held unconstitutional a congressional effort to use its jurisdictional authority to reach a result (involving the pardon power) that it could not constitutionally reach directly. *Id.,* at 146; see *Bank Markazi* v. *Peterson*, 578 U. S. ___, ___, and n. 19 (2016) (slip op., at 15, and n. 19). And the plurality, in today's opinion, carefully distinguishes from the case before us other circumstances where Congress' use of its jurisdictional power could prove constitutionally objectionable. *Ante,* at 8, and n. 3, 14, n. 6. Here Congress has used its jurisdictional power to supplement, without altering, action that no one has challenged as unconstitutional. Under these circumstances, I find its use of that power unobjectionable. And, on this understanding, I join the plurality's opinion.

Appendix to opinion of BREYER, J.

## APPENDIX

## Public Law 113–179

"SECTION 1.  SHORT TITLE.

"This Act may be cited as the 'Gun Lake Trust Land Reaffirmation Act'.

"SEC. 2.  REAFFIRMATION OF INDIAN TRUST LAND.

"(a) IN GENERAL.—The land taken into trust by the United States for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians and described in the final Notice of Determination of the Department of the Interior (70 Fed. Reg. 25596 (May 13, 2005)) is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed.

"(b) NO CLAIMS.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed.

"(c) RETENTION OF FUTURE RIGHTS.—Nothing in this Act alters or diminishes the right of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians from seeking to have any additional land taken into trust by the United States for the benefit of the Band."

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–498

_____

## DAVID PATCHAK, PETITIONER *v.* RYAN ZINKE, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2018]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR joins, concurring in the judgment.

What Congress grants, it may retract. That is undoubtedly true of the Legislature's authority to forgo or retain the Government's sovereign immunity from suit. The Court need venture no further to decide this case.

Patchak sought relief from the Secretary of the Interior "other than money damages," 5 U. S. C. §702; because he confined his complaint to declaratory and injunctive relief, the Administrative Procedure Act's (APA) waiver of the Federal Government's immunity from suit, *ibid.*, enabled Patchak to launch this litigation. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U. S. 209, 215–224 (2012) (*Patchak I*) (APA waiver of immunity covers Patchak's suit). But consent of the United States to suit may be withdrawn "at any time." *Lynch* v. *United States*, 292 U. S. 571, 581 (1934); see *Maricopa County* v. *Valley Nat. Bank of Phoenix*, 318 U. S. 357, 362 (1943) ("[T]he power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations."). Congress' authority to reinstate sovereign immunity, this Court has recognized, extends to pending litigation. *District of Columbia* v. *Eslin*, 183 U. S. 62, 65–66 (1901).

Just as it is Congress' prerogative to consent to suit, so too is it within Congress' authority to withdraw consent

once given. Retraction of consent to be sued (effectively restoration of immunity) is just what Congress achieved when it directed in the Gun Lake Act: "Notwithstanding any other provision of law, an action . . . relating to the [Bradley Property]," including any pending action, "shall not be . . . maintained in a Federal Court and shall be promptly dismissed." Gun Lake Trust Land Reaffirmation Act, Pub. L. 113–179, §2(b), 128 Stat. 1913; see H. R. Rep. No. 113–590, p. 2 (2014) (framed with *Patchak I* in view, §2(b) provides an "unusually broad grant of *immunity from lawsuits pertaining to the Bradley Property*" (emphasis added)); S. Rep. No. 113–194, p. 2 (2014) (discussing *Patchak I*); *Patchak I*, 567 U. S., at 223–224 (argument that allowing suits challenging land trust acquisitions would harm tribe's economic well-being "is not without force, but must be addressed to Congress"). Notably, the language Congress employed in the Gun Lake Act (any "action . . . relating to the [Bradley Property] . . . shall be promptly dismissed") is the mirror image of the APA's immunity waiver, which instructs that suits "against the United States" for declaratory or injunctive relief "shall *not* be dismissed." 5 U. S. C. §702 (emphasis added).

In short, Congress acted effectively to displace the APA's waiver of immunity for suits against the United States with a contrary command applicable to the Bradley Property: No action concerning the trust status of that property is currently attended by the sovereign's consent to suit. For that reason, I would affirm the judgment of the Court of Appeals for the District of Columbia Circuit upholding the District Court's dismissal of Patchak's case.*

--------

*Patchak argues that restoration of sovereign immunity would not dispose of his suit, for his claim is that federal officials have acted in excess of their statutory authority. Reply Brief 18. The argument fails because his action is, "in effect, a suit against the sovereign." *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 687 (1949); see

GINSBURG, J., concurring in judgment

---------

*Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 281–282 (1983) (officer suit is an improper vehicle for resolving property disputes with the United States); *id.,* at 284–286 (officer suit unavailable to circumvent the Quiet Title Act's reservations of immunity).

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–498

_____

## DAVID PATCHAK, PETITIONER *v.* RYAN ZINKE, SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2018]

JUSTICE SOTOMAYOR, concurring in the judgment.

I agree with the dissent that Congress may not achieve through jurisdiction stripping what it cannot permissibly achieve outright, namely, directing entry of judgment for a particular party. I also agree that an Act that merely deprives federal courts of jurisdiction over a single proceeding is not enough to be considered a change in the law and that any statute that portends to do so should be viewed with great skepticism. See *post*, at 11–12 (opinion of ROBERTS, C. J.). I differ with the dissent's ultimate conclusion only because, as JUSTICE GINSBURG explains, the Gun Lake Trust Land Reaffirmation Act (Gun Lake Act), Pub. L. 113–179, 128 Stat. 1913, should not be read to strip the federal courts of jurisdiction but rather to restore the Federal Government's sovereign immunity. See *ante,* at 1–2 (opinion concurring in judgment).

In the Court's first decision in this case, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak,* 567 U. S. 209 (2012), the sole issue of disagreement between the majority and the dissent was whether the United States had waived its sovereign immunity from Patchak's lawsuit. The majority held that Congress had done so in the Administrative Procedure Act, 5 U. S. C. §702, see 567 U. S., at 215–224, whereas the dissent concluded it had not because the case fell within the excep-

tions to the Government's waiver of sovereign immunity under the Quiet Title Act, 28 U. S. C. §2409a(a), that apply when trust or restricted Indian lands are at issue, see 567 U. S., at 228–238 (opinion of SOTOMAYOR, J.). The majority recognized, however, that Congress was free to reinstate the Government's sovereign immunity from suits like Patchak's, observing that "[p]erhaps Congress would—perhaps Congress should" bar "the full range of lawsuits pertaining to the Government's ownership of land," regardless of whether the plaintiff claims owner- ship. *Id.,* at 224. Not long after, Congress enacted the Gun Lake Act.

In addition to the reasons set forth by JUSTICE GINSBURG, *ante,* at 2, given this context, §2(b) of the Gun Lake Act is most naturally read as having restored the Federal Government's sovereign immunity from Patchak's suit challenging the trust status of the Bradley Property. That conclusion avoids the separation-of-powers concerns raised here about jurisdiction stripping. On this basis alone, I would affirm the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

No. 16–498

DAVID PATCHAK, PETITIONER *v.* RYAN ZINKE,
SECRETARY OF THE INTERIOR, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[February 27, 2018]

CHIEF JUSTICE ROBERTS, with whom JUSTICE KENNEDY
and JUSTICE GORSUCH join, dissenting.

Two Terms ago, this Court unanimously agreed that
Congress could not pass a law directing that, in the hypo-
thetical pending case of *Smith* v. *Jones*, "Smith wins."
*Bank Markazi* v. *Peterson*, 578 U. S. ___, ___, n. 17 (2016)
(slip op., at 13, n. 17). Today, the plurality refuses to
enforce even that limited principle in the face of a very
real statute that dictates the disposition of a single pend-
ing case. Contrary to the plurality, I would not cede un-
qualified authority to the Legislature to decide the out-
come of such a case. Article III of the Constitution vests
that responsibility in the Judiciary alone.

I
A

Article III, §1 of the Constitution confers the "judicial
Power of the United States" on "one supreme Court" and
such "inferior Courts" as Congress might establish. That
provision, our cases have recognized, is an "inseparable
element of the constitutional system of checks and bal-
ances," which sets aside for the Judiciary the authority to
decide cases and controversies according to law. *Northern
Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S.
50, 58 (1982) (plurality opinion). "Under the basic concept

of separation of powers," the judicial power to interpret
and apply the law "can no more be shared with another
branch than the Chief Executive, for example, can share
with the Judiciary the veto power, or the Congress share
with the Judiciary the power to override a Presidential
veto." *Stern* v. *Marshall*, 564 U. S. 462, 483 (2011) (inter-
nal quotation marks omitted).

The Framers' decision to establish a judiciary "truly
distinct from both the legislature and the executive," The
Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamil-
ton), was born of their experience with legislatures "ex-
tending the sphere of [their] activity and drawing all
power into [their] impetuous vortex," *id.*, No. 48, at 309 (J.
Madison).  Throughout the 17th and 18th centuries, colo-
nial legislatures routinely functioned as courts of equity,
"grant[ing] exemptions from standing law, prescrib[ing]
the law to be applied to particular controversies, and even
decid[ing] the merits of cases."  Manning, Response, Deriv-
ing Rules of Statutory Interpretation from the Constitu-
tion, 101 Colum. L. Rev. 1648, 1662 (2001).  In Virginia,
for instance, Thomas Jefferson lamented that the assem-
bly had, "in many instances, decided rights which should
have been left to judiciary controversy."  Notes on the
State of Virginia 120 (W. Peden ed. 1982).  And in Penn-
sylvania, the Council of Censors—a body charged with
ensuring    compliance    with    the    state    constitution—
denounced the state assembly's practice of "extending
their deliberations to the cases of individuals" in order to
ease the "hardships which will always arise from the
operation of general laws."  Report of the Committee of the
Pennsylvania Council of Censors 38, 43 (F. Bailey ed.
1784).  "[T]here is reason to think," the Censors reported,
"that favour and partiality have, from the nature of public
bodies of men, predominated in the distribution of this
relief."  *Id.,* at 38.

Given the "disarray" produced by this "system of legisla-

tive equity," the Framers resolved to take the innovative step of creating an independent judiciary. *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 221 (1995). They recognized that such a structural limitation on the power of the legislative and executive branches was necessary to secure individual freedom. As James Madison put it, "[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control." The Federalist No. 47, at 303 (citing 1 Montesquieu, The Spirit of the Laws).

The Constitution's division of power thus reflects the "concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person." *INS* v. *Chadha*, 462 U. S. 919, 962 (1983) (Powell, J., concurring in judgment). The Framers protected against that threat, both in "specific provisions, such as the Bill of Attainder Clause," and in the "general allocation" of the judicial power to the Judiciary alone. *Ibid.* As Chief Justice Marshall wrote, the Constitution created a straightforward distribution of authority: The Legislature wields the power "to prescribe general rules for the government of society," but "the application of those rules to individuals in society" is the "duty" of the Judiciary. *Fletcher* v. *Peck*, 6 Cranch 87, 136 (1810). Article III, in other words, sets out not only what the Judiciary can do, but also what Congress cannot.

Congress violates this arrangement when it arrogates the judicial power to itself and decides a particular case. We first enforced that rule in *United States* v. *Klein*, 13 Wall. 128 (1872), when the Radical Republican Congress passed a law targeting suits by pardoned Confederates. Although this Court had held that a pardon was proof of loyalty and entitled claimants to damages for property seized by the Union, see *United States* v. *Padelford*, 9 Wall. 531, 543 (1870), Congress sought to block Confederate supporters from receiving such compensation. It

therefore enacted a statute barring rebels from using a pardon as evidence of loyalty, instead requiring the courts to dismiss for want of jurisdiction any suit based on a pardon. This Court declared the law unconstitutional. Congress, in addition to impairing the President's pardon power, had "prescribe[d] rules of decision to the Judicial Department . . . in cases pending before it." *Klein*, 13 Wall., at 146. The Court accordingly held that the statute "passed the limit which separates the legislative from the judicial power." *Id.*, at 147.

We have frequently reiterated this basic premise of the separation of powers. In *Pope* v. *United States*, 323 U. S. 1 (1944), the Court recognized that "changing the rules of decision for the determination of a pending case" would impermissibly interfere with judicial independence, but held that such concerns were absent when Congress consented to a claims settlement pursuant to its broad power "to provide for the payment of debts." *Id.,* at 9; see *Chadha*, 462 U. S., at 966, n. 9 (Powell, J., concurring in judgment) ("When Congress grants particular individuals relief or benefits under its spending power, the danger of oppressive action that the separation of powers was designed to avoid is not implicated."). As we also explained in *United States* v. *Sioux Nation*, 448 U. S. 371, 398 (1980), because Congress has "no judicial powers" to render judgment "directly," it likewise cannot do so indirectly, by "direct[ing] . . . a court to find a judgment in a certain way." That sort of legislative intervention constitutes an exercise of the judicial power, leaving "the court no adjudicatory function to perform." *Id.*, at 392. Most recently, we reaffirmed the fundamental proposition that "Congress could not enact a statute directing that, in 'Smith v. Jones,' 'Smith wins.'" *Bank Markazi*, 578 U. S., at ___, n. 17 (slip op., at 13, n. 17).

### B

As the plurality acknowledges, *ante*, at 14, the facts of this case are stark. The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Band) sought land on which to build a casino. The Band identified a 147-acre tract of land in rural southwestern Michigan (called the Bradley Property), and in 2005 the Secretary of the Interior announced a final decision to take the property into trust on behalf of the Band. See 70 Fed. Reg. 25596 (2005).

Fearing an "irreversibl[e] change [to] the rural character of the area," David Patchak, a neighboring landowner, filed a lawsuit challenging the transfer. *Patchak* v. *Jewell*, 828 F. 3d 995, 1000 (CADC 2016). The suit alleged that the Secretary lacked statutory authority to take the Bradley Property into trust. The Secretary asserted several grounds for dismissing the case, but this Court ultimately granted review and determined that "Patchak's suit may proceed." *Match-E-Be-Nash-She-Wish Band of Potta-watomi Indians* v. *Patchak*, 567 U. S. 209, 212 (2012) (*Patchak I*).

Following remand, while summary judgment briefing was underway in the District Court, the Band persuaded Congress to enact a standalone statute, the Gun Lake Trust Land Reaffirmation Act (Gun Lake Act), to terminate the suit. Pub. L. 113–179, 128 Stat. 1913. Section 2(a) of the Act provides that the land "described in . . . 70 Fed. Reg. 25596"—the Bradley Property—"is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed."

Then Congress went further. In §2(b) it provided:

"NO CLAIMS.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be

promptly dismissed."

When Congress passed the Act in 2014, no other suits relating to the Bradley Property were pending, and the six-year statute of limitations on challenges to the Secretary's action under the Administrative Procedure Act had expired. See 28 U. S. C. §2401(a). The Committees that recommended the legislation affirmed that the statute would make no "changes in existing [Indian] law." H. R. Rep. No. 113–590, p. 5 (2014); S. Rep. No. 113–194, p. 4 (2014).

Recognizing that the "clear intent" of Congress was "to moot this litigation," the District Court dismissed Patchak's case against the Secretary. *Patchak* v. *Jewell*, 109 F. Supp. 3d 152, 159 (DC 2015). The D. C. Circuit affirmed, also based on the "plain" directive of §2(b). 828 F. 3d, at 1001.

## II

Congress has previously approached the boundary between legislative and judicial power, but it has never gone so far as to target a single party for adverse treatment and direct the precise disposition of his pending case. Section 2(b)—remarkably—does just that.

The plurality cites a smattering of "narrow statutes" that this Court has previously upheld. *Ante*, at 14. Yet none is as brazen as §2(b), either in terms of dictating a particular outcome or in singling out a particular party. Indeed, the bulk of those cases involved statutes that prospectively governed an open-ended class of disputes and left the courts to apply any new legal standard in the first instance. In *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421 (1856), for example, we addressed an enactment that permanently altered the legal status of a public bridge going forward by reclassifying it as a postal road. That provision, we later said, did not prescribe an "arbitrary rule of decision" but instead "left [the court] to

apply its ordinary rules" to determine whether the redesignation of the structure meant that it was an obstruction of interstate commerce. *Klein*, 13 Wall., at 146–147. And in *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429 (1992), the statute at issue made reference to specific cases only as a shorthand for identifying preexisting environmental law requirements. *Id.*, at 440. The statute applied generally—"replac[ing] the legal standards" for timber harvesting across 13 national forests—and explicitly reserved for judicial determination whether pending and future timber sales complied with the new standards. *Id.*, at 437.

Even *Bank Markazi*, which disclaimed a number of limits on Congress's authority to intervene in ongoing litigation, did not suggest that Congress could dictate the result in a pending case. There, Congress inserted itself into a long-running dispute over whether terrorist victims could satisfy their judgments against Iran's central bank, enacting a statute that eliminated certain legal impediments to obtaining the bank's assets. We upheld the law because it "establish[ed] new substantive standards" and entrusted "application of those standards" to the court. 578 U. S., at \_\_\_ (slip op., at 18).

But the Court in *Bank Markazi* did not have before it anything like §2(b), which prevents the court from applying any new legal standards and explicitly dictates the dismissal of a pending proceeding. The Court instead stressed that the judicial findings contemplated by the statute in *Bank Markazi* left "plenty" for the court "to adjudicate" before ruling that the bank was liable. *Id.*, at \_\_\_, n. 20 (slip op., at 17, n. 20). The law, for instance, did not define the terms "beneficial interest" and "equitable title." The District Court needed to resolve the scope of those phrases. Nor did it decide whether the assets were owned by the bank. That issue was also assigned to the court. And lastly, the statute did not settle whether the assets were held in New York or Luxembourg. The court

had to sort that out too. See *ibid.*[1] Section 2(b) goes much further than the statute in *Bank Markazi* by disposing of the case outright, wresting any adjudicative responsibility from the courts. For all of the plurality's discussion of the Federalist Papers and "exclusive" judicial power, *ante*, at 5, it is idle to suggest that §2(b) preserves any role for the court beyond that of stenographer.

In addition, the Court in *Bank Markazi* repeatedly emphasized that the law was not a "one-case-only regime." 578 U. S., at ___ (slip op., at 1). The law instead governed a category of postjudgment execution claims filed by over a thousand plaintiffs who, in 16 different actions, had obtained judgments against Iran in excess of $1.75 billion— facts suggesting more generality than is true of many Acts of Congress.

By contrast, §2(b) targets a single pending case. Although the formal language of the provision—reaching any action "relating to" the Bradley Property—could theoretically suggest a broader application, its practical operation unequivocally confirms that it concerns solely Patchak's suit. See *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 851 (1986) (explaining that the Court "review[s] Article III challenges . . . with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary"). In an effort to identify a set of disputes to which §2(b) might apply, the plurality asserts that the provision extends to any action relating to the trust status of the property. *Ante*, at 15. Yet as the D. C. Circuit recognized, no other cases were pending when the provision was enacted; §2(b) affected "only . . . Patchak's lawsuit." 828 F. 3d, at 1003.

_____

[1] Not every Member of the Court thought these responsibilities adequate under Article III, see *Bank Markazi*, 578 U. S., at ___–___ (ROBERTS, C. J., dissenting) (slip op., at 12–13), but all save two did, and that's a comfortable enough margin to establish the point.

And as the Band concedes, no additional suits challenging the transfer could have been filed under the APA—or any other statute of which we are aware—due to the expiration of the statute of limitations. Brief for Respondent Band 6. The plurality thus is simply incorrect when it asserts that the Act applies to a broad "class of cases." *Ante*, at 8, 15. What are those cases?

This is not a question of probing Congress's "unexpressed motives." *Ante*, at 15. The text and operation of the provision instead make clear that the range of potential applications is a class of one. Congress, in crafting a law tailored to Patchak's suit, has pronounced the equivalent of "Smith wins."

## III

The plurality refuses to "jealously guard[ ]" against such a basic intrusion on judicial independence. *Northern Pipeline*, 458 U. S., at 60. It instead focuses on general tenets of jurisdiction stripping. In its view, §2(b) falls comfortably within Congress's power to regulate the jurisdiction of the federal courts, and accordingly does not constitute an exercise of judicial power.

But nothing in §2(b) specifies that the statute is jurisdictional. That has special significance: To rein in "profligate use of the term 'jurisdiction,'" this Court in recent cases has adopted a "bright line" rule treating statutory limitations as nonjurisdictional unless Congress "clearly states" otherwise. *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 153 (2013); *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 515–516 (2006). The Gun Lake Act does not clearly state that it imposes a jurisdictional restriction— the term is not mentioned anywhere in the title, headings, or text of the Act. Indeed, we have previously found that nearly identical statutory language "says nothing about whether a federal court has subject-matter jurisdiction." *Reed Elsevier, Inc.* v. *Muchnick*, 559 U. S. 154, 164 (2010).

Compare 17 U. S. C. §411(a), the statute in *Reed Elsevier* ("no civil action . . . shall be instituted"), with §2(b) ("an action . . . shall not be filed or maintained").[2]  And since the Gun Lake Act was passed well after our series of cases setting forth a clear statement rule, we may "presume" that Congress was conscious of that obligation when it drafted §2(b).  *United States* v. *Wells*, 519 U. S. 482, 495 (1997).

After stretching to read §2(b) as jurisdictional, the plurality dedicates considerable effort to defending Congress's broad authority over the jurisdiction of the federal courts. *Ante*, at 7–10.  That background principle is undoubtedly correct—and undoubtedly irrelevant for the purposes of evaluating §2(b).  For while the greater power to create inferior federal courts generally includes the power to strip those courts of jurisdiction, at a certain point that lesser exercise of authority invades the judicial function. "Congress has the power (within limits) to tell the courts what *classes* of cases they may decide, but not to prescribe or superintend how they decide those cases." *Arlington* v. *FCC*, 569 U. S. 290, 297 (2013) (majority opinion of Scalia, J.) (emphasis added; citations omitted).  In other words, Congress cannot, under the guise of altering federal jurisdiction, dictate the result of a pending proceeding.

*Klein*, after all, drew precisely the same distinction when it considered the provision stripping jurisdiction

_____

²The plurality suggests an analogy to *Gonzalez* v. *Thaler*, 565 U. S. 134 (2012), which addressed in passing the familiar hurdle in habeas proceedings that "an appeal may not be taken" unless a judge issues a "certificate of appealability." *Id.,* at 142 (quoting 28 U. S. C. §2253(c)(1)).  But that gatekeeping requirement—which dates back to 1908—has long been understood as a direct limitation "on the power of federal courts to grant writs of habeas corpus," *Miller-El* v. *Cockrell*, 537 U. S. 322, 336–338 (2003), and appears alongside other provisions that speak in "clear jurisdictional language," *Gonzalez*, 565 U. S., at 142 (internal quotation marks omitted).  Nothing similar is at issue here.

over any suit based on a pardon. Chief Justice Chase's
opinion for the Court explained that if the statute had
"simply" removed jurisdiction over "a particular class of
cases," it would be regarded as "an exercise of the
acknowledged power of Congress to make exceptions and
prescribe regulations to the appellate power." 13 Wall., at
145, 146. But because the withdrawal of jurisdiction was
a "means to an end," founded "solely on the application of
a rule of decision," the Court held that the law violated the
separation of powers. *Ibid.*; see R. Fallon, J. Manning, D.
Meltzer, & D. Shapiro, Hart and Wechsler's The Federal
Courts and the Federal System 324 (7th ed. 2015) (recog-
nizing that "not every congressional attempt to influence
the outcome of cases, even if phrased in jurisdictional
language, can be justified as a valid exercise of a power
over jurisdiction").

Contrary to the plurality, I would hold that Congress
exercises the judicial power when it manipulates jurisdic-
tional rules to decide the outcome of a particular pending
case. Because the Legislature has no authority to direct
entry of judgment for a party, it cannot achieve the same
result by stripping jurisdiction over a particular proceed-
ing. Does the plurality really believe that there is a mate-
rial difference between a law stating "The court lacks
jurisdiction over Jones's pending suit against Smith" and
one stating "In the case of *Smith* v. *Jones*, Smith wins"?
In both instances, Congress has resolved the specific case
in Smith's favor.

Over and over, the plurality intones that §2(b) does not
impinge on the judicial power because the provision
"changes the law." See *ante*, at 6–7, 10–14. But all that
§2(b) does is deprive the court of jurisdiction in a single
proceeding. If that is sufficient to change the law, the
plurality's rule "provides no limiting principle" on Con-
gress's ability to assume the role of judge and decide the
outcome of pending cases. *Northern Pipeline*, 458 U. S., at

73.

In my view, the concept of "changing the law" must imply some measure of generality or preservation of an adjudicative role for the courts. The weight of our jurisdiction stripping precedent bears this out. Almost all of the examples the plurality cites, see *ante*, at 10, 13, contemplated the wholesale repeal of a generally applicable jurisdictional provision. See *Hallowell* v. *Commons*, 239 U. S. 506, 508 (1916) ("The [provision] applies with the same force to all cases and was embodied in a statute that no doubt was intended to apply to all."); *Cary* v. *Curtis*, 3 How. 236, 245 (1845); see also *Landgraf* v. *USI Film Products*, 511 U. S. 244, 274 (1994); *Kline* v. *Burke Constr. Co.*, 260 U. S. 226, 234 (1922). The Court, to date, has never sustained a law that withdraws jurisdiction over a particular lawsuit.

The closest analogue is of course *Ex parte McCardle*, 7 Wall. 506 (1869), which the plurality nonchalantly cites as one of its leading authorities. *McCardle* arose amid a pitched national debate over Reconstruction of the former Confederacy. William McCardle, an unreconstructed newspaper editor, was being held in military custody for inciting insurrection. After unsuccessfully applying for federal habeas relief in the circuit court, McCardle appealed to the Supreme Court, raising a broad challenge to the constitutionality of Reconstruction. The Court heard argument on his habeas appeal over the course of four days in March 1868. Before the Court could render its decision, however, the Radical Republican Congress— in an acknowledged effort to sweep the case from the docket—enacted a statute withdrawing the Supreme Court's appellate jurisdiction in habeas cases. Van Alstyne, A Critical Guide to Ex parte McCardle, 15 Ariz. L. Rev. 229, 239–241 (1973).

The Court unanimously dismissed McCardle's appeal. In a brief opinion, Chief Justice Chase sidestepped any

consideration of Congress's attempt to preclude a decision in the case. Faced with a "plain[ ] instance of positive exception," the Court held that it lacked power to review McCardle's claims. 7 Wall., at 514.

The Court's decision in *McCardle* has been alternatively described as "caving to the political dominance" of the Radical Republicans or "acceding to Congress's effort to silence the Court." Meltzer, The Story of *Ex parte McCardle*, in Federal Courts Stories 73 (V. Jackson & J. Resnick eds. 2010). Read for all it is worth, the decision is also inconsistent with the approach the Court took just three years later in *Klein*, where Chief Justice Chase (a dominant character in this drama) stressed that "[i]t is of vital importance" that the legislative and judicial powers "be kept distinct." 13 Wall., at 147.

The facts of *McCardle*, however, can support a more limited understanding of Congress's power to divest the courts of jurisdiction. For starters, the repealer provision covered more than a single pending dispute; it applied to a class of cases, barring anyone from invoking the Supreme Court's appellate jurisdiction in habeas cases for the next two decades. In addition, the Court's decision did not foreclose all avenues for judicial review of McCardle's complaint. As Chase made clear in the penultimate paragraph of the opinion—and confirmed later that year in his opinion for the Court in *Ex parte Yerger*, 8 Wall. 85 (1869)—the statute did not deny "the whole appellate power of the Court." 7 Wall., at 515. McCardle, by taking a different procedural route and filing an original habeas action, could have had his case heard on the merits.[3]

————————

[3] The plurality surmises that *McCardle* reserved an alternative avenue for relief in response to a perceived problem under the Suspension Clause. *Ante*, at 9, n. 4. But regardless of the basis for that reservation, our point is simply that, in sustaining a jurisdictional repeal that leaves a claimant without any prospect for relief, the plurality goes beyond what the Court in *McCardle* upheld.

Section 2(b), on the other hand, has neither saving grace. It ends Patchak's suit for good. His federal case is dismissed, and he has no alternative means of review anywhere else. See 25 U. S. C. §1322(a) (providing that state courts, absent the consent of the tribe, may not exercise civil jurisdiction over trust land). Section 2(b) thus reaches further than the typical jurisdictional repeal, which "takes away no substantive right but simply changes the tribunal that is to hear the case," *Landgraf*, 511 U. S., at 274. Because §2(b) singles out Patchak's suit, specifies how it must be resolved, and deprives him of any judicial forum for his claim, the decision to uphold that provision surpasses even *McCardle* as the highwater mark of legislative encroachment on Article III.

Indeed, although the stakes of this particular dispute may seem insignificant, the principle that the plurality would enshrine is of historic consequence. In no uncertain terms, the plurality disavows any limitations on Congress's power to determine judicial results, conferring on the Legislature a colonial-era authority to pick winners and losers in pending litigation as it pleases. The Court in *Bank Markazi* said it was holding the line against this sort of legislative usurpation. See 578 U. S., at ___–___, and n. 17, ___ (slip op., at 12–13, and n. 17, 18). The plurality would yield even that last ditch.

## IV

While the plurality reaches to read the Gun Lake Act as stripping jurisdiction, JUSTICE GINSBURG's concurrence, joined by JUSTICE SOTOMAYOR, strains further to construe §2(b) as restoring the Government's sovereign immunity from suit. To reinstate sovereign immunity after it has been waived, Congress must express "an unambiguous intention to withdraw" a remedy. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1019 (1984). Congress has not made that showing here. Section 2(b)—which provides that "an

action . . . relating to the [Bradley Property] . . . shall be promptly dismissed"—bears none of the unmistakable hallmarks of a provision withdrawing the sovereign's consent to suit.

The concurrence first relies on a hunch, based on the Court's earlier determination that Patchak's suit was not barred by sovereign immunity. See *Patchak I*, 567 U. S., at 224. But hunches do not make for an unambiguous expression of intent. Nor, of course, does one lone reference to "immunity" in the legislative history. *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 37 (1992) ("[T]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon . . . cannot be supplied by a committee report.").

Saving the text for last, the concurrence fails to identify a single instance where the Court has treated a statute that does not mention "immunity," "consent to be sued," or even the "United States" as restoring sovereign immunity. The only basis for its interpretation is the purported similarity between the language of the Gun Lake Act and the waiver of immunity in the Administrative Procedure Act. In drawing this comparison, however, JUSTICE GINSBURG leaves out the critical element of that waiver. See *ante*, at 2 (opinion concurring in judgment). In full, the APA provision states that a suit "shall not be dismissed . . . *on the ground that it is against the United States*." 5 U. S. C. §702 (emphasis added). Section 2(b), as noted, contains no such reference to the sovereign.

As for JUSTICE BREYER's concurrence, "dot[ting] all the i's," "simplif[ying] judicial decisionmaking," and "eliminat[ing] the cost of litigating a lawsuit" are nothing but cavalier euphemisms for exercising the judicial power. *Ante*, at 2. JUSTICE BREYER assumes that §2(a) is constitutionally unobjectionable, and that §2(b) seeks the same "real-world result." *Ibid.* But if §2(a) is constitutional, it is because the provision establishes new substantive

standards and leaves the court to apply those standards in the first instance. That is the rule set forth plainly in *Bank Markazi.* And if that is so, §2(b) does not simply supplement §2(a)—it short-circuits the requisite adjudicative process and decides the suit outright. The proper allocation of authority under the Constitution is very much part of the "real world." Pursuant to that basic equilibrium, Congress cannot "gild the lily" by relieving the Judiciary of its job—applying the law to the case before it.

\* \* \*

The Framers saw this case coming. They knew that if Congress exercised the judicial power, it would be impossible "to guard the Constitution and the rights of individuals from . . . serious oppressions." The Federalist No. 78, at 469 (A. Hamilton). Patchak thought his rights were violated, and went to court. He expected to have his case decided by judges whose independence from political pressure was ensured by the safeguards of Article III—life tenure and salary protection. It was instead decided by Congress, in favor of the litigant it preferred, under a law adopted just for the occasion. But it is our responsibility under the Constitution to decide cases and controversies according to law. It is our responsibility to, as the judicial oath provides, "administer justice without respect to persons." 28 U. S. C. §453. And it is our responsibility to "firm[ly]" and "inflexibl[y]" resist any effort by the Legislature to seize the judicial power for itself. The Federalist No. 78, at 470.

I respectfully dissent.